[Sac. No. 6912.   In Bank.   Feb. 16, 1960.]

Estate of HARRY AUSLENDER, Deceased. MORRIS AUSLEN, Respondent, v. HARRY AUSLEN, Appellant.

George Olshausen for Appellant.

Leonard S. Lurie for Respondent.

PETERS, J.—These are appeals from (1) an order of December 20, 1956, settling, approving, and allowing the first account of Harry Auslen, as coadministrator of the above-entitled estate; (2) an order of March 18, 1957, settling, approving, and allowing the second supplement to the account of Leonard S. Lurie, attorney for Morris Auslen, coadministrator of the estate; and (3) an order of March 18, 1957, settling, approving, and allowing the second supplement to the account of Morris Auslen, coadministrator of the estate.

### CHRONOLOGY

On September 29, 1952, Harry Auslender (hereafter called "decedent") died. He was at that time a resident of Sacramento County, California.

On October 20, 1952, Harry Auslen and Morris Auslen (hereafter referred to as "Harry" and "Morris"), who are brothers, were duly appointed and qualified as coadministrators of the estate of decedent. They are nephews of the decedent.

Until February 3, 1955, Leonard S. Lurie was attorney for both coadministrators and since such date has continued to represent Morris as coadministrator. After February 3, 1955, Devlin, Diepenbrock and Wulff became the attorneys for Harry as coadministrator.

Notice to creditors was regularly given, the first publication having been made on October 31, 1952, and the time to present claims has expired. All creditors' claims have been cleared.

On January 13, 1954, an inventory was filed by the coadministrators, listing, among other items, a commercial account in the Anglo-California National Bank in the amount of $5,675.14 and a second commercial account in the same bank amounting to $19,317.80. A note relating to the latter item recited that the coadministrators had taken the account into their possession, but that the ownership was disputed by Elton

Investment Company, a corporation (hereafter called "Elton"), which had filed a suit in the superior court to establish ownership of the fund.

The inventory listed 2,500 shares in Fashion Shop, a California corporation (hereafter called "Fashion"), appraised at $14,705.89, and 20,002 shares of Elton, appraised at $35,750.

There was listed a claim against Fashion, appraised at $12,867.52. To this item there was appended a note stating that Fashion had filed a claim against the estate in the sum of $25,000 and had brought suit upon it.

There were two promissory notes listed, one calling for payment to decedent of $1,410.76 and the other of $2,685.02. To these items there was appended a note reciting that their ownership was in dispute and was the subject of an action brought by Fashion, in which that corporation claimed ownership.

There were two parcels of real estate listed, one of which is not here involved. The second parcel was a portion of Lot 4 in the block bounded by J and K, 6th and 7th Streets, in the city of Sacramento, appraised at $70,000. A note was appended to the listing of this item, stating that Elton claimed ownership and had brought an action to establish its title.

The total appraisal figure was $162,983.03.

On May 7, 1954, the Superior Court of Sacramento County, in the exercise of its general jurisdiction, pursuant to a stipulation between the plaintiff and the defendant coadministrators, rendered a judgment in favor of Fashion against the estate of decedent, decreeing that Fashion owned the two promissory notes claimed by it and directing delivery of the notes to it by the coadministrators. The judgment also decreed that Fashion have judgment against the coadministrators as such for the sum of $10,000, to be paid in due course of administration, but further decreed that Fashion "pay out and expend a sum of not to exceed Two Thousand Five Hundred Dollars ($2500.00) for and on account of the administration expenses of said estate," the same when so paid to constitute "a pro tanto satisfaction of the money judgment."

On the same day, that is May 7, 1954, the Superior Court of Sacramento County, in the exercise of its general jurisdiction, pursuant to a stipulation between the plaintiff and the defendant coadministrators, entered a judgment in the suit brought by Elton, decreeing that Elton was the owner of the real property at 7th and J Streets, in the city of Sacramento, and directing conveyance of the property by the coadministra-

tors to Elton. The decree also provided that Elton recover the sum of $50,000, to be paid by the estate in the due course of administration, but that Elton "pay out and expend a sum of not to exceed Seven Thousand Five Hundred Dollars ($7,500.00) for and on account of the administration expenses of the estate," the same when so paid to constitute "a pro tanto satisfaction of the money judgment."

After the rendition of the two judgments, the coadministrators filed a supplemental inventory wherein they eliminated from the inventory as first filed the property adjudged to belong to the two corporations.

The background of the two actions by the two corporations against the estate is as follows:

Harry had investigated their stock ownership and had found that, according to the stock books, decedent had owned 20,002 shares of the capital stock of Elton and Celia Appelbaum, a sister of decedent, 14,000 shares thereof and decedent had owned 2,500 shares of the capital stock of Fashion and Celia Appelbaum 1,750 shares thereof. There was also strong evidence that Celia Appelbaum was merely a dummy stockholder for the benefit of decedent, and that she held as his trustee.

The trial court, in the instant action, found that the decedent was the sole legal and equitable owner of all the shares of both corporations and also that "each of said corporations was a pure instrumentality of said decedent, and each of said corporations was the alter ego of said decedent."

After decedent's death on September 29, 1952, there occurred a series of corporate meetings. Officers were elected, and as to both corporations there were created the offices of treasurer and managing director. Harry was elected to those offices "with full and unlimited authority to act for and in behalf of [naming the corporation] in all matters pertaining to the same." Morris became a director of both corporations. Resolutions were adopted for the respective corporations declaring that the coadministrators as such owned 20,002 shares of the capital stock of Elton and Celia Appelbaum owned 14,000 shares thereof and that the coadministrators as such owned 2,500 shares of the capital stock of Fashion and Celia Appelbaum owned 1,750 shares thereof. New stock certificates were issued accordingly. It appears that Harry later became trustee of the shares allegedly owned by Celia Appelbaum.

At later corporate meetings reports were made to the effect that investigation of the affairs of the corporations indicated

that much of the property standing in the name of decedent really belonged to one or other of the two corporations, and the corporate officers were directed to take steps to protect the interests of each corporation in respect thereto. The managing director was ordered to make a thorough study of the situation, and the secretary was authorized to file claims against the estate if just claims on behalf of the corporations against the estate were indicated.

Claims were filed but were rejected by the coadministrators, and thereafter suits were brought by the corporations, resulting in the judgments to which reference has been made.

There were two groups of heirs, one called the "Eastern heirs" and the other the "Western heirs." The Eastern heirs were entitled to receive 60 per cent of decedent's distributable estate, and the Western heirs were entitled to 40 per cent.

Harry attempted to purchase the interests of the Eastern heirs for the benefit of the Western heirs. After an extended trip East and many negotiations, he succeeded in purchasing the interests of the Eastern heirs for $25,000. They all assigned their interests to him as trustee for the Western heirs. The assignments were presented to the probate court and approved.

APPEAL FROM ORDER OF DECEMBER 20, 1956, SETTLING, APPROVING, AND ALLOWING THE FIRST ACCOUNT OF HARRY AUSLEN, AS COADMINISTRATOR OF THE ESTATE

In settling Harry's account, the court rejected his claim that he was not required to account for the funds and property which by the two judgments had been decreed to belong to the corporations.

The court's findings were that the judgments had been procured by the fraud of both coadministrators; that the two judgments were entered upon the stipulation of the defendant coadministrators when they knew that the estate had a factually supported and meritorious defense to the actions; that it was their duty as coadministrators to present that defense; and that their failing to do so constituted fraud. The court further found that at the time of decedent's death he had been the sole legal and equitable owner of all the shares of stock of both Elton and Fashion; that during his lifetime the corporations were pure instrumentalities of decedent; that each of them was the *alter ego* of decedent; and that therefore the separate entity of each corporation, for the purpose of the accounting, was to be wholly disregarded and the activities,

assets and liabilities of each considered and treated as being those of decedent. The court further found that the consent judgments were void because obtained by the extrinsic fraud of the coadministrators and that each judgment, for the purposes of the accounting, was to be disregarded.

Harry's primary contention is that the court below was without power to thus hold the consent judgments void. He relies upon the well settled rule that a probate court is without power to determine adverse claims to properties of an estate in the course of administration when such claims are asserted by "a stranger to the estate." (*Estate of Hart,* 51 Cal.2d 819 [337 P.2d 73]; *Central Bank* v. *Superior Court,* 45 Cal.2d 10 [285 P.2d 906]; *Schlyen* v. *Schlyen,* 43 Cal.2d 361 [273 P.2d 897]; *Estate of Dabney,* 37 Cal.2d 672 [234 P.2d 962].) Harry claims that this rule is applicable here.

This rule is not inflexible. It has several exceptions. As early as the case of *Theller* v. *Such,* 57 Cal. 447, decided in 1881, it was said, "The Probate Court has jurisdiction to settle *the estate* of a deceased person, and has no power, save in certain excepted instances, to determine disputes between the heirs or representatives of the deceased and third persons." (P. 459.) These "excepted instances" are court-made and not statutory. They are discussed in *Schlyen* v. *Schlyen, supra,* and in greater detail in *Central Bank* v. *Superior Court, supra.* As noted in the Central Bank case (45 Cal.2d at p. 15), "The first and most common [type of controversy where the superior court sitting in probate can properly try title] is that between the estate or those acting in its behalf and the executor or administrator thereof acting in his personal capacity." Some of the reasons for this exception are stated in *Schlyen* v. *Schlyen* (43 Cal.2d 361 at p. 373) : "The determination of such a controversy is an incident to the proper settlement of the estate. (*Stevens* v. *Superior Court, supra,* 155 Cal. 148.) All of the parties to the proceeding are in privity with the estate and it is their distributive rights that are affected by the proceeding in probate. If the personal representative is improperly claiming property to which the estate is entitled the court may try the issue and surcharge his account for purposes of distribution. A judgment outside of probate would be binding only on the parties thereto, whereas if the matter be determined in the probate proceedings the judgment would be 'conclusive against all persons interested in the estate. . . .' (Prob. Code, § 931.) It is because of the foregoing and perhaps other reasons that the courts have said

that a controversy of this nature should be adjudicated in probate.''

■ This exception is here applicable. It is, of course, true that Harry does not, as an individual, own any stock in the Elton and Fashion corporations. But the facts show that Harry holds every incident of ownership except title, and that in filing suit against the estate on behalf of the corporations, he was ''acting in his personal capacity.'' Both corporations made Harry managing director and treasurer ''with full and unlimited authority to act for and in behalf of [naming the corporation] in all matters pertaining to the same.'' In addition, Harry could vote all the shares standing in the decedent's name and exercise all rights incident thereto. (Corp. Code, § 2200.) The decedent's shares which Harry held as administrator thus gave him almost complete control over the corporations, even without regard to the broad, limitless grant of authority given him as managing director. Moreover, Harry's subsequent appointment as trustee of the shares allegedly owned by Celia Appelbaum insured his continuing in complete control of the corporations.

In view of Harry's complete control of the corporations, and the fact that Celia Appelbaum, the other nominal stockholder, is also an heir, there is the requisite privity to the estate. It is only through an adjudication in the probate court that the estate can be properly, honestly and expeditiously settled. In this regard it should be noted that, were the probate court without power to make the determination below, possibly two more lawsuits would be required to protect the estate and the heirs and restore the property justly belonging to the estate. The first would be an action to have the judgments against the estate set aside for fraud, and if that action were successful, it would then be necessary to bring another action to set aside the order of the probate court settling the account. (See *Tobelman* v. *Hildebrandt,* 72 Cal. 313 [14 P. 20].) Court calendars are crowded enough without the addition of needless litigation.

■ There is another theory upon which the action of the court below may be supported. This theory is outlined in *Estate of McSweeney,* 123 Cal.App.2d 787 [268 P.2d 107]. In that case, as in the instant case, the accounting was challenged on the ground of fraud committed by the executor. In both cases the fraud consisted of the conduct of the executor or administrator in permitting a judgment to be entered against the estate, under circumstances where a valid defense was

available. In the McSweeney case evidence tending to show this fraud was offered in the superior court sitting in probate but was excluded; in the instant case, the superior court sitting in probate admitted the evidence, and, finding that the administrator had acted fraudulently and in violation of his trust, declared the judgments void and surcharged the administrator's account for the property involved in these judgments. The McSweeney case held that the evidence should have been admitted, stating: "The appellants were not attacking the quiet title decree as such. They were attacking the accounting proposed by the executors by trying to show that the executors had been derelict in their duty to preserve and to protect the estate by failing to defend the quiet title suit." (123 Cal.App. 2d at p. 794.) This reasoning is directly applicable here. It would indeed be unreasonable to hold, under the circumstances now before us, that a superior court sitting in probate was without power to surcharge the account of an administrator or executor as an incident of its function to settle estates of deceased persons and pass upon final accounts.

The power of the probate court to void the consent judgments cannot be doubted. As stated in *Guardianship of Cornaz*, 8 Cal.2d 347, at page 359 [65 P.2d 784], "The probate court, while sitting in matters of probate, is a court of general jurisdiction, and in determining any questions arising in the administration of an estate which it is authorized to decide may bring to its aid 'the full equitable and legal powers with which as a superior court it is invested.'" This holding has recently been reaffirmed in *Estate of Charters*, 46 Cal.2d 227, 236 [293 P.2d 778].[1] (See also *Estate of Bell*, 168 Cal. 253 [141 P. 1179], and *Verdier* v. *Roach*, 96 Cal. 467 [31 P. 554].) In the instant case Harry's conduct of the affairs of the estate, as detailed in his account, was brought into question. The court had jurisdiction to determine the controversies over the property involved in the consent judgments. The court below, having determined that Harry acted fraudulently and in violation of his trust, properly, under the rule enunciated in the Cornaz and Charters cases, invoked its equitable power to set

[1]It is true, as contended by Harry, that *Security-First Nat. Bank* v. *Superior Court*, 1 Cal.2d 749 [37 P.2d 69], holds that a probate court has no power to set aside its own orders or decrees which have become final, on the ground that extrinsic fraud has been practiced in obtaining such orders or decrees. However, insofar as that case holds that a probate court cannot set aside its prior order, which order has become final, on the ground of extrinsic fraud, it appears to have been impliedly overruled by *Estate of Charters*, 46 Cal.2d 227 [293 P.2d 778].

aside the judgments obtained by such fraud. (*Cf. Carney* v. *Simmonds,* 49 Cal.2d 84, 94 [315 P.2d 305].)

It is true, as contended by Harry, that a judgment by default or by stipulation on the part of the executor or administrator may sometimes be valid. (*Chase* v. *Swain,* 9 Cal. 130.) However, Harry has cited no cases upholding the validity of such judgments where it has been shown or alleged that a meritorious defense existed but was not raised or where some other fraud has been practiced by the executor or administrator. There is authority to the contrary. (*Estate of McSweeney,* 123 Cal.App.2d 787 [268 P.2d 107]; *Jordan* v. *Clausen,* 13 Cal.App.2d 16 [56 P.2d 240].) In view of the duty of the executor or administrator to protect and defend the estate and conserve its assets, it is not surprising that such judgments have been held invalid. The court below properly held that Harry had acted fraudulently.

Harry further contends that there can be no extrinsic fraud because Morris, the respondent here, was the coadministrator and not only knew that Harry was an officer of the corporations when the consent judgments were taken, but also knew of and was a party to many of the events and transactions prior to the taking of the consent judgments. Harry points out that Morris had been present when he (Harry) was appointed treasurer and managing director, that Morris himself was a director of the corporations, and that Morris was present when a suit against the estate on notes held by Elton against decedent was discussed. The court below recognized that Morris was as guilty of malfeasance as Harry, finding that "[the judgments] are each void because the *two* administrators were guilty of extrinsic fraud in consenting to and stipulating for each of said judgments." (Emphasis added.)

The question is really whether an administrator can object to his coadministrator's accounting on the ground of fraudulent conduct in which he took part. Harry relies on the principle that a party cannot take advantage of his fraud. It seems obvious that Morris is not "taking advantage" of his fraud; rather, he is in the position of righting the wrong he has done. He has had a change of conscience. To hold that an administrator cannot disclose his fraud and object to the accounting of his coadministrator who has also acted fraudulently is absurd and would encourage concealment of fraud and discourage the honest administration of estates. Where an administrator has joined in some misconduct with his coadministrator to the detriment of the estate, no obstacles

should be placed in the way of full disclosure of the wrong-doing so as to protect the estate and conserve its assets. Moreover, it must be remembered that the administrator or executor represents the estate and the heirs. The action here was properly brought on their behalf by Morris in his representative capacity.

It follows that the court below properly ordered that the assets and liabilities of the two corporations be considered as part of the decedent's estate. It further follows that the court below properly disallowed the transfer of $10,031.81 from the account of the administrators to the account of Elton. This amount represented rent from the property at 7th and J Streets in Sacramento, which property had been the subject of the suit by Elton. Since the judgment in that suit has been declared void, there is no basis for Elton's right to the rental proceeds, and consequently Harry's transfer of the proceeds was improper.

Harry raises several other points that require comment. He first contends that the heirs get a double inheritance under the orders of the probate court, in that he is required to pay into the estate out of his own pocket the sum which the estate has paid into the corporations (apparently pursuant to the judgments rendered against the estate) while at the same time the shares of the corporations, which form a portion of the estate assets, have increased in value to the extent that said sum has been transferred. The contention is without merit. Harry is not directly required to pay anything out of his own pocket. He is only required to have on hand and account for a certain amount of money. Since the probate court has directed that the assets of the corporations be considered as part of the decedent's estate, it is unlikely that Harry will be required to pay anything out of his pocket, at least insofar as the corporations' cash accounts reflect amounts transferred from the estate. Moreover, to the extent that amounts are transferred from the corporations' cash accounts to the estate, there will be a proportionate decrease in the value of the shares of the corporations.

Equally without merit is Harry's contention that his conduct of the estate has not injured the heirs. It is sufficient to point out that acquiring property outright and acquiring shares of a corporation which owns the property are two entirely different things, particularly where one person has almost complete control of the corporation.

Another item of the December 20, 1956, order under attack refers to the $25,000 paid to the Eastern heirs as consideration for the assignment of their interests to Harry as trustee for the Western heirs. Paragraph 6 of that order recites that: "The heirs of the decedent have been divided into two groups, commonly referred to as the Western Heirs and the Eastern Heirs. The Western Heirs consist of a sister named Celia Appelbaum, and five nieces and nephews consisting of Harry Auslen, William Auslen, Morris Auslen, Kate Abrahams and Pauline A. Lurie. The Eastern Heirs consist of a brother named Morris Auslander, a sister named Eva Goldberg, and a niece and nephew named Helen Klein and Edward Goldberg. The Eastern Heirs, in addition to counsel in New York City, N. Y., and in Chicago, Illinois, were represented in all estate matters by James K. Bullock, attorney in Sacramento, California. The Eastern Heirs who as a group were entitled to a sixty per cent (60%) distributive interest in the decedent's estate transferred and assigned their interest in the estate to Harry Auslen, as Trustee for the Western Heirs, for an agreed consideration of Twenty Five Thousand Dollars ($25,000.00). These assignments are on file, and have been regularly approved by this Court. Said consideration of Twenty Five Thousand Dollars ($25,000.00) was paid to said Eastern Heirs by Harry Auslen out of funds which had originally been part of decedent's estate, but credit for the same is not allowable to him as a probate expense and he is to be surcharged therefor, together with interest at seven percent (7%) per annum on said sum from April 23, 1954. Harry Auslen on distribution may claim credit to the extent of the amount paid said Eastern Heirs, with said interest."

Harry contends that the court below erred in surcharging his account for the amount of the consideration paid the Eastern heirs because the probate court had previously approved the assignments and this order had become final. It is argued that use of estate funds was included or necessarily involved in the order and thus cannot be questioned now. Harry argues that the only possible purpose of the order approving the assignments was the approval of the payment of estate funds.

The contention is without merit. Neither the petition for an order approving the assignments nor the order itself indicates that estate funds had been used to pay the Eastern heirs. The judge approving the assignments obviously was unaware that

estate funds had been used, for it was the same judge who disallowed the payment as a probate expense in the court below. The obvious purpose of the order seeking approval of the assignments was to preclude possible objections when the assignees, the Western heirs, sought distribution. ▮▮▮ Under section 1020.1 of the Probate Code the court may refuse to make distribution pursuant to an assignment, except on terms it deems just and reasonable, where it finds the consideration unreasonable or where the assignment was obtained by fraud, duress or undue influence. An order approving the assignment binds all the parties when it becomes final. (*Burchell* v. *Strube,* 43 Cal.2d 828, 835 [279 P.2d 1].) ▮▮▮ The court below was correct in holding that the payment of estate funds to the Eastern heirs was not a probate expense and in surcharging Harry's account.

▮▮▮ Harry contends that the $25,000 with which his account was surcharged involves a duplication. The $25,000 payment can be traced to two sources. The first is the $10,031.81 in rental proceeds that was transferred to Elton and has already been discussed, and the second is an $18,000 withdrawal of estate funds by Harry, which was then deposited in the Elton account. Harry's account has been surcharged for $10,031.81, the rentals erroneously transferred, and for $25,000, the payment to the Eastern heirs, or a total of $35,031.81. The total sum withdrawn, however, was only $28,031.81. Thus the surcharge is excessive in the amount of $7,000. The order of the court below should be modified so as to reduce the surcharge for the payment of estate funds to the Eastern heirs to $18,000, plus interest at 7 per cent.

▮▮▮ It should be noted also that Harry may claim credit on distribution to the extent of the amount paid the Eastern heirs, plus the interest he is required to pay on the amount with which he is surcharged. Thus Harry suffers no injury.

▮▮▮ The probate court disallowed a credit in the amount of $857.53 for travel expenses incurred by Harry while negotiating the assignments of the interests of the Eastern heirs. ▮▮▮ Such expenses are allowable only when necessary to the actual conduct of the estate. (Prob. Code, § 900; *Estate of Zaring,* 93 Cal.App.2d 577, 580 [209 P.2d 642]; 21 Cal.Jur.2d 88.) Whether or not the expenses were incurred in the conduct of estate business was a question of fact. ▮▮▮ Although the evidence on this point is conflicting, Harry contending that the estate benefited by avoiding

litigation, there is ample evidence in the record to support the implied finding of the probate court that Harry was not involved in estate matters when the travel expenses were incurred.

The only other items contested in this phase of the case are the payments received by Harry from the Elton and Fashion corporations. They total $1,200 and $300, respectively, and, according to the resolutions passed by the corporations, the amounts were ''to be used by him for such expense or expenditure as he may incur on behalf of the Company.'' These items were disallowed by the probate court ''because no supporting proof was furnished.'' The record indicates that the court was concerned by the absence of specific evidence as to what Harry did with the payments. The court inferred during one of the hearings that the payments could conceivably have been reimbursements for valid estate expenses, even though incurred for the corporations. The specific proof the court desired was apparently never furnished. We cannot presume that there was error, and under the circumstances now before us, it must be held that the disallowance of the $1,200 and $300 credits was proper.

There is a great deal of discussion in the briefs as to whether the court could properly find that the Elton and Fashion corporations were the *alter ego* of the decedent. *Estate of Miller,* 50 Cal.App.2d 405 [123 P.2d 118], holds that the probate court has the power to make such a finding. This holding was correct. In an appropriate case, application of the *alter ego* doctrine may be the only way in which the executor or administrator can secure certain property belonging to the estate. There is nothing unusual about this. All that is being done is including in the estate *all* the property owned by the decedent during his lifetime.

Harry relies on the following statement in *Estate of Barreiro,* 125 Cal.App. 153 [13 P.2d 1017] : ''Whether or not deceased during his lifetime operated in Mexico through the Compania as his *alter ego* is no concern of the probate court, as the *alter ego* question between deceased and the Compania is not material and can have no bearing on the conduct of the executor in the administration of the estate.'' (125 Cal.App. at p. 177.) This statement is much too broad, and in any event must be confined to the facts of that case which are not comparable to those here involved.

APPEALS FROM ORDERS OF MARCH 18, 1957 SETTLING, APPROVING, AND ALLOWING SECOND SUPPLEMENT TO ACCOUNT OF LEONARD S. LURIE, ATTORNEY FOR MORRIS AUSLEN, COADMINISTRATOR OF THE ESTATE, AND SECOND SUPPLEMENT TO ACCOUNT OF MORRIS AUSLEN, COADMINISTRATOR OF THE ESTATE

Morris and his attorney each filed an account of expenditures and asked reimbursement against the estate. Harry objected to each on the ground that they were unsupported by proper vouchers or other proof.[2] In his demand for a transcript on appeal from the orders approving the accounts and ordering reimbursement, Harry requested a transcript of the settlement proceedings, including all vouchers transmitted and all evidence, oral and documentary, received in proof. He now urges that the orders appealed from are not supported by proof and that they must therefore be reversed.

An examination of the transcript discloses no record of any proof having been made. Morris and his attorney point out that the accounts were verified and contained averments that the expenditures were for the benefit of the estate and were reasonable and proper and necessarily made. As far as the record discloses, no vouchers or receipts were furnished, and no testimony was received from either Morris or his attorney or from any other source. Therefore, the orders allowing the accounts must be reversed. This, however, is done without prejudice to a further hearing on this issue.

The order surcharging Harry's account with $25,000 with interest at 7 per cent from April 23, 1954, is modified by reducing the principal sum to $18,000; the orders allowing the supplemental accounts of Morris and his attorney are reversed and the matters remanded for further proceedings. In all other respects, the orders appealed from are affirmed. In the interest of justice, and acting under rule 26(a) of the Rules on Appeal, it is ordered that each party shall bear his own costs on this appeal.

Gibson, C. J., Traynor, J., Spence, J., and White, J., concurred.

[2]Section 925 of the Probate Code reads in part: "Except as hereinafter provided, the executor or administrator, in rendering his account, must produce and file vouchers for all payments which he has made. The vouchers must remain on file until returned or destroyed as hereinafter provided. . . ."

McCOMB, J.—I dissent. I would reverse the orders surcharging Harry's account with the assets of the corporations and with the sums of $10,031.81, $25,000, $1,200, and $300 and reverse the orders allowing the supplemental accounts of Morris and his attorney. Otherwise, I would affirm the orders from which an appeal has been taken.

On March 16, 1960, appellant's petition for modification of the opinion or for a rehearing was denied; respondent's petition for modification of the opinion was granted and the opinion was modified to read as printed above. McComb, J., was of the opinion that the petition for a rehearing should be granted.