[No. D008987. Fourth Dist., Div. One. Feb. 9, 1990.]

LINNEA RYDBERG GOLDBERG et al., Plaintiffs and Appellants,
v.
FRANK A. FRYE III et al., Defendants and Respondents.

**COUNSEL**

Thompson & Thompson and Peter R. Thompson for Plaintiffs and Appellants.

McInnis, Fitzgerald, Rees, Sharkey & McIntyre, Thomas E. Sharkey, Ralph W. Peters, Higgs, Fletcher & Mack and John Morris for Defendants and Respondents.

**OPINION**

**FROEHLICH, J.**—Plaintiffs and appellants are general legatees under the will of Philip Hahn. Their complaint seeks damages against the administrator of the Hahn estate, Vincent E. Whelan, and the attorney for the administrator, Frank A. Frye III. The appeal seeks reversal of judgment in favor of both defendants, rendered upon motions for summary judgment.

### FACTS AND PROCEDURAL BACKGROUND

Philip and Sadie Hahn were married in New York in 1925. Philip's employment was with the Crosman Arms Company, a family enterprise. The company grew during Philip's management from a business of little value into one of great worth. In 1971 the company was merged with the Coleman company, the result of which was distribution of publicly traded stock to Philip, Sadie and their five children (who had been given Crosman Arms stock previously by Philip). Philip himself received stock in the merged company worth approximately $10 million.

Philip and Sadie's marriage was not entirely successful, Sadie leaving Philip in 1930, returning in 1937, and the two of them separating for good in 1955. Philip and Sadie executed a property settlement agreement in 1958 which provided monthly support for Sadie and committed Philip to bequeath to her at his death one-third of his estate. Shortly thereafter they were divorced.

In 1964 Philip created a charitable foundation called the Philip Y. Hahn Foundation (Foundation). Substantial assets were contributed to the

Foundation by Philip over the succeeding years. He also established an estate planning device called a "Unitrust," to which a large block of his stock was transferred. The Unitrust provided that income would be paid to Philip during his lifetime, then after his death to his second wife Muriel, and the remainder on Muriel's death to the Foundation. At the time of creation of the Unitrust Philip's estate was estimated to be worth $5 million.

Philip died in 1975. His estate at that time had decreased substantially because of a reduction in the value of his stock, and was worth approximately $1.3 million. Philip's will made provision for Sadie, for his current wife Muriel, and specified $5,000 legacies for each of eight grandchildren and a $50,000 legacy for Linnea Rydberg Goldberg, who had been his longtime nurse.

Sadie filed suit against the estate, the Foundation and the Unitrust, claiming that the inter vivos transfers by Philip violated the terms of their marital settlement agreement. This action was settled by an agreement executed among the parties in February 1980 and approved by the probate court by order dated August 1, 1980. Although Muriel Hahn executed the settlement agreement as administratrix, she was replaced shortly thereafter by administrator Vincent Whelan, who filed the petition for approval of the compromise on July 11, 1980. The settlement provided for substantial installment payments to Sadie, obligating jointly the Foundation, the Estate of Hahn, and Muriel.

The estate was unable to make timely payments, and the obligation as a practical matter fell upon the Foundation. Tax counsel for the Foundation had obtained a ruling from the Internal Revenue Service to the effect that payment by the Foundation would jeopardize its charitable standing unless all assets of the estate were first exhausted. Based upon this situation, Whelan on July 29, 1980, petitioned the probate court for permission to enter into an agreement under the terms of which the Foundation would advance funds to Sadie, but would be reimbursed by the estate, as, when and to the extent that funds became available to the estate. The probate court, by order dated August 11, 1980, authorized Whelan (on behalf of the estate) to enter into the reimbursement agreement.

In subsequent accountings by Whelan to the probate court, it was indicated that reimbursement of the Foundation for sums paid Sadie would deplete the estate, making it impossible to pay the specific bequests to the grandchildren and Goldberg (hereafter legatees). The legatees had received notice of the hearings in 1980 at which both the settlement agreement and the reimbursement agreement were approved, as well as notice of hearings of later reports and accounts by the administrator to the court. They made no

formal court appearance, however, until May 1985, when they objected to Whelan's fourth account and petition for distribution. Whelan had first advised Goldberg to obtain independent counsel in February 1984, and more urgently in April 1985. Counsel for the legatees appeared at all subsequent hearings.

Hearings were subsequently held on Whelan's fifth and sixth accounts. In September 1986 the court entered an order denying the legatees' objections to the accounts, denying their requests for distribution from the estate, concluding that the reimbursement agreement was intended as a document of indemnity in favor of the Foundation, and directing that funds be transferred to the Foundation.

The legatees filed their complaint against Whelan and his attorney, Frye, in November 1987. It was entitled an action for legal malpractice, breach of fiduciary duty, extrinsic fraud and negligence. The legatees claimed that Whelan and Frye had acted imprudently in negotiating the settlement agreement and the reimbursement agreement. They complained that they had not been given adequate notice of the likely effect of these agreements upon their expectancies from the estate, with the result that they had not appeared or contested the action taken in 1980. The legatees further complained that the defendants had breached fiduciary duties by occupying positions of conflict. Whelan's law firm represented the Foundation at the same time Whelan served as administrator of the estate, and special tax counsel for the Foundation who obtained the tax ruling (upon which the reimbursement agreement was founded) was also from Whelan's law firm.

Upon the defendants' motion for summary judgment, the trial court concluded that the plaintiffs were collaterally estopped from seeking damages against Whelan by virtue of the final decree of the probate court, and that no showing of extrinsic fraud (which might permit avoidance of the estoppel) had been made. As to Frye, the court granted the summary judgment by concluding he served only as attorney for the administrator, and owing no duty to the legatees could not be held liable to them in negligence.

## DISCUSSION

■ We first consider the claim against Whelan, the administrator. Without deciding, and indeed without addressing the question, we assume that Whelan's actions as administrator could have been negligent, or inappropriate, or in some way subject to challenge by the legatees. ■ ■ ■
■ His service as a fiduciary for the estate at a time when his law firm represented an adverse party, the Foundation, could well have been cause

for complaint by the legatees.[1] The issue before us is whether any and all such claims or potential claims were settled and resolved by the judgment of the probate court approving Whelan's final account and discharging him as administrator. Whelan contends that under Probate Code section 931 and Code of Civil Procedure section 1908, subdivision (a) (1) the judgment is a final and conclusive determination of claims against the administrator. The order was appealable under Probate Code section 1240 and Code of Civil Procedure section 904.1, subdivision (j). Having failed to appeal, the legatees, as participants in the litigation which was the subject of the judgment, are bound by the judgmental discharge and cannot attempt a collateral attack.

Whelan relies upon general principles of res judicata. ■ Prior litigation between the same parties is a bar not only to issues which were actually raised but to causes of action which could have been litigated. (See, e.g., *Sutphin* v. *Speik* (1940) 15 Cal.2d 195 [99 P.2d 652] and *Interinsurance Exchange of the Auto. Club* v. *Superior Court* (1989) 209 Cal.App.3d 177 [257 Cal.Rptr. 37].) Whether the legatees ever actually sought to surcharge the administrator, their objections to the account and their opposition to the requests for instructions demonstrate they were aware of facts now giving rise to their collateral attack. ■ Armed with such knowledge, Whelan contends, the legatees were obliged to raise their contentions of malfeasance at the time of his final accounting, and having failed to do so cannot now assert them in a separate action.

The legatees rely on *Security-First Nat. Bk.* v. *Superior Court* (1934) 1 Cal.2d 749 [37 P.2d 69] and *Neubrand* v. *Superior Court* (1970) 9 Cal.App.3d 311 [88 Cal.Rptr. 586]. They contend their damage occurred in 1980, when the commitments represented by the marital settlement agreement and the reimbursement agreement were sealed. They were prevented from contesting these actions, they contend, by the wrongful failure of Whelan (and Frye) to advise them of the significance of same. This constitutes, they claim, extrinsic fraud and renders the judgment made thereon amenable to subsequent collateral attack. The *Security-First* and *Neubrand*

---

[1] We emphasize at this point that neither this court nor the trial court was called upon to determine, nor did we attempt determination of, the factual assertions made in the complaint against Attorneys Whelan and Frye. Coming to us as it does, following a ruling in favor of the defendants on motions for summary judgment, we are required to construe strictly the moving papers and affidavits of the moving parties (defendants here) and to construe liberally the position of the party opposing the motions (plaintiffs here). (*Albertini* v. *Schaefer* (1979) 97 Cal.App.3d 822, 831 [159 Cal.Rptr. 98].) We therefore must assume the potential establishment of the factual assertions made by the plaintiffs. That we adopt these assumptions for purpose of considering this appeal does not in any way suggest a factual determination by this court that there is any truth to the assumptions. We labor to emphasize this point to avoid any impression of criticism of the actual conduct of Whelan and Frye. We have no way of knowing what that actual conduct was, and certainly render no opinion herein that it was in any way improper or unprofessional.

authorities are cited for the proposition that such collateral attack cannot be brought in the probate court, the jurisdiction of which is limited, but must be sought in the general equity jurisdiction of the superior court. For this reason, the legatees argue, they were precluded from asserting their claims at the time of final accounting in the probate court, and were required, and are now permitted, to do so in the subsequent collateral action.

We conclude the legatees' position is not well taken, and affirm Whelan's contention that his decree of discharge protects him from subsequent suit for alleged misdeeds during his term as administrator. It is acknowledged that the *Security-First* case laid down a restrictive rule respecting the power of the probate court. It stated that "the probate court is not vested with power to avoid its own orders or decrees which have become final on the ground that extrinsic fraud has been practiced in obtaining the order or decree[,]" holding that such power was reserved for the superior court sitting as a court of general equity jurisdiction. (*Security-First Nat. Bk.* v. *Superior Court, supra,* 1 Cal.2d 749 at pp. 757-758.) Subsequent authority, however, has eroded this broad statement.

In *Estate of Charters* (1956) 46 Cal.2d 227 [293 P.2d 778], a trustee sought settlement of an account which included the sale of an asset in which a minor beneficiary had an interest. The order approving the sale had been made during a prior accounting period and had long since become final. The beneficiary's objection in the later accounting, therefore, depended upon a finding of extrinsic fraud in the earlier hearing—some circumstance which "deprived [the minor] of the opportunity to present her claims to the court." (*Id.* at p. 236.) Notwithstanding its recognition and citation of the *Security-First* case, the *Charters* court found the probate court to have jurisdiction to set aside its earlier order. "Having jurisdiction of the controversy between the trustee and the beneficiary of the trust . . . the court could 'bring to its aid the full equitable and legal powers with which as a superior court it is invested.' (*Guardianship of Cornaz,* 8 Cal.2d 347, 359 [65 P.2d 784].)" (*Estate of Charters, supra,* 46 Cal.2d 227, 236.)

Even closer to the facts of the instant case is *Estate of Auslender* (1960) 53 Cal.2d 615 [2 Cal.Rptr. 769, 349 P.2d 537]. In that case an accounting by an administrator was challenged on the ground that a prior judgment against the estate, final at the time of the accounting, had been obtained by means of fraud of the administrator. The surcharge of the administrator based upon a finding of prior wrongful conduct leading to the judgment against the estate was upheld. In determining questions arising in the administration of the estate the probate court is authorized to "bring to its aid 'the full equitable and legal powers with which . . . a superior court . . . is invested'" and in the invocation of its equitable power is entitled to set

aside judgments obtained by fraud. (*Estate of Auslender, supra*, 53 Cal.2d 615, 626, quoting *Guardianship of Cornaz, supra*, 8 Cal.2d 347 at p. 359.)

Here, the legatees contend that Whelan entered into improvident commitments on behalf of the estate, that he was in violation of conflict of interest rules, and that he prevented a full and fair hearing of the issues by failing adequately to advise those interested in the estate. Assuming these allegations, if proved, constitute extrinsic fraud, they vest the injured party with the same nature of relief as specified in *Charters* and *Auslender*. The legatees at the time of the final accounting had full knowledge of the injuries allegedly imposed upon them. Having the right then to seek surcharge of the administrator, they relinquished it by failing to assert it.

The legatees contend that *Neubrand* v. *Superior Court, supra*, 9 Cal.App.3d 311 supports their position. We disagree. In *Neubrand*, heirs seeking a portion of a decedent's estate on the basis of Probate Code sections 228 and 229 moved to vacate a decree of distribution on the ground that they had received no notice of the probate proceeding or the petition for distribution. The motion to vacate the decree was denied by the probate court on the ground that it lacked jurisdiction to consider it, even though the court conceded that the same motion might be brought "by means of an appropriate civil action." (*Id.* at p. 315.) In upholding the trial court the Court of Appeal noted the limited statutory powers of the probate court (*id.* at p. 318) and held, citing *Security*, that a collateral attack on a final probate judgment could not be mounted by bare motion in the probate court. *Charters* and *Auslender* were distinguished as representative of setting aside prior final orders when the issue is raised (or subject to being raised) in a normal probate proceeding, such as the settling of a fiduciary account.

Here, Whelan was presenting his sixth and final account. His entire period of estate administration was subject to review. The legatees knew of Whelan's actions and decisions in 1980 and thereafter, and affirmatively raised questions pertaining thereto. If Whelan was to be surcharged for deficiencies in his administration of the estate, that was the time to seek it. Failure to raise the issue results in loss of the power later to do so. (See *Tobelman* v. *Hildebrandt* (1887) 72 Cal. 313, 315-316 [14 P. 20]; *Willson* v. *Security-First Nat. Bk.* (1943) 21 Cal.2d 705, 709 [134 P.2d 800].)

The legatees' claim against Attorney Frye cannot be resolved on the same ground as that utilized for administrator Whelan. Whelan is absolved of liability by the statutory procedure for approval of his report which envisages the possibility of surcharge for misconduct. No similar procedure is available to heirs or others interested in the estate in terms of malpractice by the attorney for the administrator. ■ Said attorney cannot be

surcharged by the probate court for losses incurred by the estate. (*Estate of Lagios* (1981) 118 Cal.App.3d 459, 463 [173 Cal.Rptr. 506].) Settlement of the administrator's final account and termination of estate proceedings therefore have no effect upon potential liability of the administrator's attorney for malpractice, except insofar as confirmation of the administrator's action may imply approval of the advice given him by his counselor.

Attorney Frye is joined as a defendant only in the first cause of action of the first amended complaint. His negligence which caused damage to the legatees is alleged to have been failure to notify them of the significance of the 1980 hearings and failure, "at all times thereafter," to exercise reasonable care in the performance of services for the estate beneficiaries. (First amended complaint, ¶ 25.) We know from documents in the file that the legatees were represented by independent counsel as early as 1985, and at that time were fully apprised of the conduct of Frye which they now claim constitutes negligence. The trial court ruled in Frye's favor on the ground of lack of duty by Frye to the legatees.

█ Contrary to the allegations of the complaint, it is well established that the attorney for the administrator of an estate represents the administrator, and not the estate. (*In re Ogier* (1894) 101 Cal. 381, 385 [35 P. 900]; *Estate of Kruger* (1904) 143 Cal. 141, 145 [76 P. 891]; *Baldock* v. *Green* (1980) 109 Cal.App.3d 234, 240 [167 Cal.Rptr. 157].) A key element of any action for professional malpractice is the establishment of a duty by the professional to the claimant. Absent duty there can be no breach and no negligence. (*Budd* v. *Nixen* (1971) 6 Cal.3d 195, 200 [98 Cal.Rptr. 849, 491 P.2d 433]; *Ventura County Humane Society* v. *Holloway* (1974) 40 Cal.App.3d 897, 902 [115 Cal.Rptr. 464].) By assuming a duty to the administrator of an estate, an attorney undertakes to perform services which may benefit legatees of the estate, but he has no contractual privity with the beneficiaries of the estate.

It is, of course, conceivable that the attorney for an administrator could undertake to perform legal services at the behest of, and as attorney for, a beneficiary of the estate. Under such assumed facts a duty would be created directly in favor of the beneficiary, an attorney-client relationship would be established, and the beneficiary would have recourse against the attorney for damages resulting from negligent representation. There is no evidence in this case (resorting to the documentation in support of and in opposition to the motions for summary judgment, as well as having recourse to the allegations of the first amended complaint), however, to support the establishment of an attorney-client relationship by virtue of direct contacts between Frye and Goldberg, or any of the other legatees. Therefore, if the legatees are to have grounds for an action for malpractice against Frye, they

must rely on circumstances and principles, from which a duty may arise *absent* privity of contract, and not based upon an attorney-client relationship.

■ The principles governing such duty are set forth in 1 Mallen & Smith, Legal Malpractice (3d ed. 1989) section 7.11, page 382. The determination of duty rests upon the assessment of six considerations: "(1) the extent to which the transaction was intended to affect the plaintiff; (2) the foreseeability of harm to the plaintiff; (3) the degree of certainty that the plaintiff suffered injury; (4) the closeness of the connection between the defendant's conduct and the injury; (5) the policy of preventing future harm; and (6) whether recognition of liability under the circumstances would impose an undue burden on the profession."

The predominant inquiry, Mallen states, is whether the principal purpose of the attorney's retention is to provide legal services for the benefit of the plaintiff. For example, the intention of a testator to benefit legatees, through the retention of an attorney to draft his will, can confer a cause of action in favor of a disappointed legatee against the negligent draftsman. (See, e.g., *Lucas* v. *Hamm* (1961) 56 Cal.2d 583 [15 Cal.Rptr. 821, 364 P.2d 685]; *Biakanja* v. *Irving* (1958) 49 Cal.2d 647 [320 P.2d 16, 65 A.L.R.2d 1358].)

■ Viewing the legatees' claim in this light, we find it impossible to conclude that the parties to the attorney's contract—Whelan and Frye—entered into same for the principal purpose of providing benefit to the legatees. We find nothing to indicate that this attorney's retention was in any respect different from the typical retention of counsel by the fiduciary of a decedent's estate. As noted above, such retention constitutes the counselor the attorney for the fiduciary, and not the attorney for the estate, its beneficiaries, its creditors or others who may be interested therein.

Innumerable instances in modern practice are encountered in which services performed by an attorney will benefit others besides his client. The enforcement of contractual rights by a contractor will benefit the contractor's employees. Successful labor litigation on behalf of a union will benefit the union members. Responsible representation of a city, county or other governmental unit will improve the lot of its citizens and employees. In each of these instances the fortunes of third parties are affected by the performance of an attorney retained by a client not a member of the benefited group. The fact that third parties are thus benefited, or damaged, by the attorney's performance does not give rise to a duty by the attorney to such third parties, and hence cannot be the basis for a cause of action by the third parties for the attorney's negligence. In these cases the third parties are incidental beneficiaries, and "[a]n incidental benefit does not suffice to

impose a duty upon the attorney." (1 Mallen & Smith, *supra*, § 7.11, p. 385; *Mason* v. *Levy & Van Bourg* (1978) 77 Cal.App.3d 60, 67-68 [143 Cal.Rptr. 389] [attorney's contractual right to a percentage of contingency fee gave no direct right to sue successor attorney for failure to process the lawsuit].)

Particularly in the case of services rendered for the fiduciary of a decedent's estate, we would apprehend great danger in finding stray duties in favor of beneficiaries. Typically in estate administration conflicting interests vie for recognition. ■ The very purpose of the fiduciary is to serve the interests of the estate, not to promote the objectives of one group of legatees over the interests of conflicting claimants. (See, e.g., *Estate of Poisl* (1957) 153 Cal.App.2d 661 [315 P.2d 98].) The fiduciary's attorney, as his legal adviser, is faced with the same task of disposition of conflicts. It is of course the purpose and obligation of both the fiduciary and his attorney to serve the estate. In such capacity they are obligated to communicate with, and to arbitrate conflicting claims among, those interested in the estate. While the fiduciary in the performance of this service may be exposed to the potential of malpractice (and hence is subject to surcharge when his administration is completed), the attorney by definition represents only one party: the fiduciary. It would be very dangerous to conclude that the attorney, through performance of his service to the administrator and by way of communication to estate beneficiaries, subjects himself to claims of negligence from the beneficiaries. The beneficiaries are entitled to evenhanded and fair administration by the fiduciary. They are not owed a duty directly by the fiduciary's attorney. (Cf. *Estate of Effron* (1981) 117 Cal.App.3d 915, 928-930 [173 Cal.Rptr. 93].)

■ We conclude, therefore, that the summary judgment in favor of Attorney Frye was properly granted.

DISPOSITION

The judgment of the superior court is affirmed. Respondents are entitled to their costs. ■ Whelan seeks an award of attorney fees. He points to the fact that fees would have been awarded for the successful defense of this claim had such claim been brought before the closing of the estate. Failure now to award fees will tax him personally, which is unfair since he served as a professional fiduciary and should not incur personal loss absent fault. While sympathetic to this position, we know of no basis for an award of fees (and Whelan has cited none) other than on the ground of frivolous appeal.[2]

---

[2] *Estate of Trynin* (1989) 49 Cal.3d 868 [264 Cal.Rptr. 93, 782 P.2d 232], the most recent Supreme Court case on the subject of compensation for attorneys rendering services for decedents' estates, which confirms an entitlement to fees for services rendered in preparing or defending the fee petition, has no application to the respondents' request in this case. In *Trynin*

Being unable to characterize the appeal as frivolous, we regretfully deny the request for attorney fees.

Benke, Acting P. J., and Huffman, J., concurred.

the fee award was based upon Probate Code section 910 and was payable out of estate funds. Since the estate in this case has been closed, there is no practical method of awarding fees from estate assets, and we find no Probate Code authority for attempting recovery of assets for the satisfaction of postclosing services by the estate's former counsel or its administrator.