[No. G019597. Fourth Dist., Div. Three. Jan. 21, 1999.]

Estate of ANTHONY BONACCORSI, Deceased.
JOSEPH A. RICCA, Petitioner and Appellant, v.
SALVATORE BONACCORSA et al., Objectors and Respondents.

## COUNSEL

Williams & Martinet, Leonard J. Martinet and Zenobia Lal-Wadia for Petitioner and Appellant.

Kenneth R. Farrow for Objectors and Respondents.

**OPINION**

**CROSBY, J.**—In this probate matter, the discharged administrator of an estate appeals from orders surcharging him $134,200 for breach of fiduciary duty, denying statutory and extraordinary fees, and imposing an additional $50,000 in attorney fees for bad faith.

We disallow the surcharge for the depreciated value of the decedent's residence ($50,000) and the fee award, but affirm the remaining surcharges. Substantial evidence supports the court's determination that the administrator unreasonably voted the beneficiaries' stock to run a "corporation" (whose principal asset consisted of the decedents' private residence) outside probate. There is ample support in the record that the administrator "proceeded thereafter to bleed the corporation of its liquid assets" by paying himself excessive fees and reimbursements. He was properly found to have operated at his own peril in so acting without court supervision or approval.

I

For some 23 years, Anthony Bonaccorsi, the decedent, lived together with his half sister Lydia Fabiano in a 3-bedroom house on Galaxy Drive on a quarter-acre site in the Back Bay area overlooking the Newport Beach bluffs. Also living in the house were Fabiano's sister, Nancy Nodes, and Terry Schifani, the housekeeper.

Fabiano did occasional work as an interior decorator in the 1980's, renting a small Newport Beach storefront for a design studio. She set up a corporation (called Lydia's) to run the business. Its principal asset was the Newport house, which she deeded in 1987. She held a 52 percent interest in the corporation, with Bonaccorsi (the only other shareholder) holding the remaining 48 percent.

Fabiano died on February 14, 1991. Bonaccorsi barely outlived her, dying two weeks later on March 1. By that time Lydia's was virtually moribund; "[t]here was no business" and it was "essentially nonexistent." The studio had been closed years before and its inventory hauled to storage.

The near-simultaneous deaths of Fabiano and Bonaccorsi left each of their respective estates without an executor. Nodes asked appellant Joseph A. Ricca to become a successor executor of her sister's estate because "[h]e was the only person I knew and that was close to the family." Schifani, a named

beneficiary in Bonaccorsi's will, asked Ricca to similarly serve in the Bonaccorsi estate. The remaining Bonaccorsi beneficiaries lived in Italy.[1]

Ricca immediately sprung into action. On March 7, 1991, one week after Bonaccorsi's death, Ricca voted 100 percent of the shares to elect himself as president and managing director of Lydia's. Schifani's attorney, Brian Lippold, was the other active director, and Nodes was appointed as a third "dummy" director.[2]

Ricca did not have any legal authority to vote the shares of stock. (He had yet to be appointed administrator of either estate.) He was appointed administrator with the will annexed in September 1991, and letters of administration were issued in October 1991. Lippold acted as the estate's attorney.

The estate's principal asset was Bonaccorsi's 48 percent interest in the corporation. Following an inventory a probate referee valued this interest at $196,000 based on the following: (1) the house, which had an appraised equity of $410,000;[3] (2) the corporation's checking account, with $46,000 in cash; (3) its "inventory" of home furnishings, assessed at $14,000; (4) and a 1984 Chrysler, worth $3,000.

Ricca listed the house for sale in February 1992 for an asking price of $890,000. He retained a local real estate agent, who hoped to sell it in the high $700,000's. The house was on the market for more than a year and a half and was shown to about 50 to 70 potential buyers. Two low offers around $500,000 were rejected.

Nodes continued to live in the house, rent free, providing caretaker services, including light housecleaning and some flower gardening. She testified she kept the house in "A-1" condition. The corporation paid the mortgage, utilities and maintenance costs (homeowners insurance, gardener, spa and pool service, etc.), but Ricca occasionally advanced bills from his personal funds. Sometimes he wrote checks from the Bonaccorsi estate to pay them: "[I]t just depended upon what money was in what account, and I would use it and then reimburse it." He never obtained court permission to borrow money from Bonaccorsi's estate to put into the corporation.

---

[1] Some of the beneficiaries spell their family surname "Bonaccorsa" rather than "Bonaccorsi."

[2] At trial Nodes could not remember ever having been a director of Lydia's. She described her management philosophy: "Mr. Ricca always explains, but I'm not much for business and that. I leave it in his hands."

[3] In March 1991, a probate referee appraised the house's fair market value at $740,000. The mortgage balance at the time was $384,000, leaving an equity of $410,000.

The house finally sold in September 1993 for $625,000. Lydia's received $137,000 from the sale, which Ricca deposited in the corporate bank account.

Most of Ricca's acts during this period were taken in his capacity as sole shareholder, president and managing director of Lydia's. Although Lydia's did no business, Ricca authorized payments exceeding $38,400 to Lippold and himself for "services which were rendered . . . to close out the company's affairs . . . ."[4] Ricca did so without informing the probate court or seeking its authorization "because it was not necessary. We were running the business as a corporation."

Ricca paid himself an additional $4,000 for an undocumented debt for accounting services he allegedly performed for Lydia's in the late 1980's or early 1990's. He also reimbursed himself $25,000 for cash advances for house expenses and routine repairs. Ricca never filed a creditor's claim for any advances made by him after the date of death because "[t]hese were advances to the company . . . not to the estates."

Lydia's was finally dissolved in 1994. By that time, Ricca and Lippold had taken some $71,582 in payments from the corporation.

Ricca did not file his first and final account until January 1995, three years after letters were issued. The amended report showed a liquidation value of Bonaccorsi's 48 percent interest at $45,145, or a loss to the estate of more than $155,655 from the original appraisal.

In April 1995, Joseph Ventress, acting as attorney in fact for the five Italian beneficiaries, filed objections to the amended account. A five-day trial was held in January 1996, resulting in the $184,200 surcharge for unauthorized expenditures and attorney fees.

## II

The court did not abuse its discretion in finding Ricca breached his duty "to vote the stock to the best interest of the beneficiaries of the estate." Ricca assumed a stunning number of different (and conflicting) roles: sole shareholder, president, managing director, creditor, and independent professional. He did so without the supervision or approval of the court. It is not

---

[4]Ricca received $21,822 in fees, and Lippold was paid $16,600. Ricca testified he performed "substantial services" to Lydia's over a 3-year period, including 290 hours of "accounting services" (billed at $35 per hour), 111 hours of "low-grade business services" (billed at $50 per hour), and 77 hours of "corporate management services" (billed at $200 per hour).

surprising he was surcharged for his unauthorized and unjustified expenditures.

■ No personal representative is "totally immune from judicial scrutiny" with respect to a corporation wholly owned by a decedent. (*Estate of Massaglia* (1974) 38 Cal.App.3d 767, 779 [113 Cal.Rptr. 751].) He or she is required to use "ordinary care and diligence" in managing and controlling the estate. (Prob. Code, § 9600, subd. (a); see also Ross, Cal. Practice Guide: Probate 2 (The Rutter Group 1998) ¶ 14:147, p. 14-34.9, rev. # 1, 1998 ["When the estate owns a controlling corporate interest, a relatively high measure of responsibility may be assigned to the estate representative. Therefore, it is ordinarily advisable for the representative to seek court authorization for retention of the interest and any participation in the business, as well as advice on or determination of the responsibilities which may be expected to attend such participation."].)

■ Exercising his sole control over 100 percent of the shares in Lydia's, Ricca assumed a direct role in conducting its affairs. He was more than a simple shareholder in a corporation run by others. Along with Lippold, he himself ran the closely held corporation at the same time he concurrently was responsible to the beneficiaries as a fiduciary for the estates.

Ricca's voluntary role as corporate manager distinguishes this case from *Estate of Massaglia, supra,* 38 Cal.App.3d 767, upon which he relies. In *Massaglia* the court freed a special administrator from the need of submitting to the court corporate decisions taken by a corporation of which he was the sole shareholder. That was because the corporation (which owned and operated Santa Monica's famed Miramar Hotel) maintained its independent corporate existence during the decedent's lifetime and when the administrator succeeded to the stock ownership. (*Id.* at p. 777.) Under those circumstances " 'the power of the estate . . . is to vote the stock, *not to run the corporation,*' " and the probate court has a limited role. (*Id.* at p. 779.)

This appeal presents a different story. The "corporation" passively owned a 3-bedroom house, rather than actively operating a 300- or 400-room hotel. Its "books" were in "unbelievable" condition during the decedents' lifetimes. There was no accountant; Bonaccorsi, who had Parkinson's disease, took on this task, but was unable to do so.

In his roles as shareholder-cum-owner-cum-manager-cum-director-cum-administrator, Ricca freely commingled funds between the corporate, estate, and his own personal accounts. He took whatever money was available to

pay outstanding bills without adequate documentation. Outsiders also treated the corporate entity as interchangeable with the estates. The bank, for example, refused to give Ricca access to a corporate bank account until he was appointed administrator, and Ricca himself believed he could not put the house (although ostensibly held by the corporation) on the market until he received that appointment.

And even *Massaglia* found the probate court retained jurisdiction to determine whether the administrator acted vis-à-vis the corporation as would a prudent shareholder. (*Estate of Massaglia, supra,* 38 Cal.App.3d at p. 779.) *Massaglia* imposed a duty of care on administrators "to at least exercise that degree of prudence and diligence which one of ordinary judgment would use in connection with his own affairs." (*Ibid.*) That same "prudent shareholder" standard was employed by the court below.[5]

More on point is *Estate of Barreiro* (1932) 125 Cal.App. 752 [14 P.2d 786], where the probate court was found to have properly exercised its jurisdiction to surcharge an executor for excessive expenses incurred by a closely held corporation whose management the executor assumed by virtue of voting all of the corporate stock. Having found "that the executor dominated and controlled all of the affairs of the corporation following the [testator's] death," *Barreiro* refused to allow the executor to hide behind the same corporate entity to protect himself from losses to the beneficiaries caused by his mismanagement. (*Id.* at p. 763.)

Given all his hats and his frequent disregard of the corporate form, Ricca cannot now forswear any duty to the estates arising from his active management of Lydia's. From a public policy standpoint, it makes little sense to require these beneficiaries to bring a separate shareholder's derivative suit against Ricca, as he suggests. Considering Ricca's "complete control" of Lydia's, "there is the requisite privity to the estate. It is only through an adjudication in the probate court that the estate can be properly, honestly and expeditiously settled. In this regard it should be noted that, were the probate

---

[5]Ricca believed he owed no duty to the beneficiaries in voting the corporate stock, as demonstrated in the following exchange: "THE COURT: . . . : Do you understand, when you were appointed as an administrator and owned that 100 percent of stock of the corporation, you could only vote that stock for the best interest of the beneficiaries? [¶] [RICCA]: No, I did not understand that."

In his petition for rehearing, Ricca makes the frivolous argument the court committed prejudicial error by precluding him from calling Attorney Galvin Keene as an expert regarding corporate operations, including the tax consequences of transferring the property to the estate. However, Ricca's counsel made no such offer of proof. To the contrary, this is all he said: "I don't believe I can call [Keene] because he is quite infirm at this time, as I speak. [¶] THE COURT: He may not be a witness? [¶] MR. LIPPOLD: He may not be a witness." There is nothing in this exchange about the substance or importance of Keene's testimony.

court without power to make the determination below, possibly two more lawsuits would be required to protect the estate and the heirs and restore the property justly belonging to the estate. . . . Court calendars are crowded enough without the addition of needless litigation." (*Estate of Auslender* (1960) 53 Cal.2d 615, 625 [2 Cal.Rptr. 769, 349 P.2d 537]; see also Ross, Cal. Practice Guide: Probate 2, *supra*, ¶ 14:81, p. 14-20, rev. #1, 1998 ["A representative who accepts more responsibility than he or she can reasonably expect to fulfill faces substantial risk of *surcharge* for business losses and liabilities."].)

Ricca says he must be presumed "to have acted fairly, honestly, in good faith, [and] without negligence in the discharge of his fiduciary obligations." There is substantial evidence to show otherwise. Ricca testified he devoted nearly 480 hours to "manage" the affairs of this defunct corporation, which did nothing more than own a house, some furniture and a car. These characteristics are shared by virtually every homeowner in Orange County. We doubt most people would believe it reasonable to hire a $200-per-hour corporate manager and an equally high-priced attorney to spend thousands of dollars to "manage" such assets, or that it would take the equivalent of three months of full-time work (five days a week, eight hours a day) to perform such routine affairs like paying a mortgage, making minor repairs, and filing tax returns.

The court was justifiably incredulous too, particularly when Ricca failed to seek court authorization for his fees and reimbursements: "You don't do things in an estate when someone dies without getting the court's permission. You don't hire attorneys without court permission. . . . You don't take money out of an estate account, i.e., the insurance proceeds, and start giving it to a corporation, loaning or otherwise, without getting the court's consent."

Ricca compounded these delicts by assuming unsupervised control of a corporation to whom he was a primary creditor. He even transferred ownership of the decedents' automobile to himself as partial payment for services allegedly rendered by him to Lydia's before Fabiano's death. ▓▓ As a leading commentator has observed, "In all events . . . estate representatives should *never* attempt to personally continue decedent's business if the activity would put them in an actual *or potential* compromising, *conflict of interest* position. [¶] For example, serious conflicts of interest are posed where the estate representative is a *creditor* of the business . . . . Simply stated, if the representative has any personal interests at stake in the business, he or she should stand aside in favor of other disinterested competent managers." (Ross, Cal.Practice Guide: Probate 2, *supra*, ¶ 14:83, p. 14-20, rev. #1, 1997.)

Ricca speciously emphasizes that "[a]ll of [his] actions as the director and majority shareholder of Lydia's . . . *were approved in the Fabiano Estate*" over objection from the Bonaccorsi beneficiaries. But the court did not decide the substance of the objections; instead it denied the beneficiaries standing to raise them. There was no decision on the merits. If anybody has unduly benefited, it is Ricca, who has not been held to account for his maladministration of Fabiano's 52 percent share in Lydia's.

## III

Ricca says the court should have offset any surcharge for his "purely technical shortcomings" to account for the "substantial services" he and Attorney Lippold conferred on Lydia's. He asks the matter be remanded for a finding of the reasonable value of these services.

Ricca misconstrues the nature of the probate court's wide discretion to subsequently ratify unauthorized expenditures by an administrator. While the court is vested with the power to reimburse an administrator for acts done without a previous order, it is not obliged to do so. That court determines whether unauthorized expenditures by an administrator were necessary, reasonable, and of benefit to the estate; " 'unless it appears that such discretion has been abused, it is *not* subject to review. . . .' " (*Estate of Massaglia, supra,* 38 Cal.App.3d at p. 774, italics added.)

Ricca ignores the substantial evidence rule when he claims his services substantially benefited Lydia's. The court reasonably concluded Lydia's could have been liquidated within a month without need for Ricca's extraordinary expenses. Its assets were nearly dissipated during the three and one-half years of Ricca's stewardship. The court found "clear and convincing evidence" that Ricca and Lippold intended to transfer funds properly belonging to the estate to themselves as "so-called fees and expenses" so that "if there was any objection, anybody blocked distribution, they already had some money out in another account that they could deal with because they were in absolute control over those funds once distributed from the corporation."

It would be highly inequitable to give Ricca another chance to pare his overcompensation to a reasonable amount. It was Ricca who chose to operate outside the supervision of the court and to bill excessive fees and costs beyond the value of his services. The beneficiaries, on whose behalf probate was conducted, were the victims of his breach of trust. As such, they should not have to endure the burden and expense of yet another hearing.[6]

The same considerations support the court's discretionary determination not to award statutory fees and extraordinary fees. Only a clear abuse of

---

[6]There is even less cause to challenge the court's surcharge of $2,945 for overpaying a creditor's claim. Ricca now says the sums were not for a creditor's claim, but for "additional

discretion will lead us to overturn such a determination. (*Estate of Downing* (1982) 134 Cal.App.3d 256, 266-269 [184 Cal.Rptr. 511].) Courts specifically may disallow compensation for services rendered negligently or in breach of trust. This reflects the "strong public policy in favor of the prompt closing and distribution of estates." (*Estate of Heller* (1992) 7 Cal.App.4th 862, 867 [9 Cal.Rptr.2d 274].) The court did not abuse its discretion.

## IV

■ Ricca objects to being surcharged for loss on the sale of the house. The court found: "As a result of the delay in selling the house or liquidation of the corporation, the Court determines the loss to the estate to be $50,000[], to be considered as an item of damages." Listed at $890,000, the house sold 20 months later for $625,000—considerably less than its appraised value of $740,000.

The uncontradicted evidence attributed this decline in value purely to a depressed real estate market. There was no showing the sale was fraudulent or collusive, the house was overpriced, or the real estate agent was incompetent or inept. And, as Ricca notes, there was no evidence "that the residence could have been sold earlier, or [of] the amount of damages which resulted from the delay in selling the house." The court itself acknowledged these deficiencies: "And I have some concern. The Court really heard no evidence as to the declining market, what would have been a normal loss to the estate. . . . Many sales of real property turn out to be a loss because . . . it may lose value during [the time it was up for] sale. . . . So I have some difficulty in trying to compute the loss of value to the estate."

The beneficiaries make no effort to respond to these contentions. The $50,000 surcharge for loss of sale cannot stand in the absence of any substantial evidentiary support.

A different situation applies to the surcharge of $36,000 for lost rental value. Faced with an inactive real estate market, high monthly mortgage and maintenance expenses, and a fixed (and diminishing) cash account, the court acted within its discretion in surcharging Ricca for allowing Nodes to remain on the property rent free. Rental income could have been used to offset expenses.

Ricca says there is no evidence "anyone would rent the property" because of its structural unsoundness and because of uncertainties regarding a potential sale. He justifies his decision not to charge rent because Nodes helped clean the house and liked to work in the garden.

administrative expenses." Since no transcript references are provided for this claim, we decline to search the record to corroborate these assertions. Ricca's "elementary duty" is to set forth all of the evidence on an issue "if the sufficiency thereof is challenged." (*Estate of Massaglia, supra,* 38 Cal.App.3d at p. 778.) The issue is waived.

The court understandably took a different view. There was ample evidence the property was in sufficiently good shape ("A-1" condition, according to Nodes) to be rented for a substantial sum. Ricca testified the property had a reasonable rental value of $3,000 per month. The court determined the reasonable rental value of the beneficiaries' share at $1,500 per month. This sum took into account the beneficiaries' 48 percent interest in the corporation, the value of Nodes's services, the uncertain duration of any rental term, and the necessity of making the property available for showing. The record supports the surcharge for lost rental value.

## V

Even where successful, the beneficiaries must bear their own attorney fees in contesting an accounting of an estate. An exception exists only where the administrator opposes the contest "without reasonable cause and in bad faith." (Prob. Code, § 11003, subd. (b).)[7]

Since we reverse a substantial part of the surcharge ($50,000 out of $134,000), we cannot fault Ricca for opposing the contest. The beneficiaries have not asked that any fee award be apportioned between meritorious and unmeritorious claims. The $50,000 fee award for attorney fees for bad faith cannot be sustained under these circumstances.

The judgment is reversed with directions to enter judgment in accordance with the views expressed above. In the interests of justice, each party is to bear its own costs on appeal.

Wallin, Acting P. J., and Rylaarsdam, J., concurred.

A petition for a rehearing was denied February 16, 1999, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied May 12, 1999.

---

[7]Probate Code section 11003, subdivision (b) provides, "If the court determines that the opposition to the contest was without reasonable cause and in bad faith, the court may award the contestant the costs of the contestant and other expenses and costs of litigation, including attorney's fees, incurred to contest the account. The amount awarded is a charge against the compensation or other interest of the personal representative in the estate and the personal representative is liable personally and on the bond, if any, for any amount that remains unsatisfied."