Filed 2/7/25  Studer v. Bresler CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MELODY STUDER, et al.<br><br>    Plaintiffs and Respondents,<br><br>v.<br><br>PETER BRESLER, et al.<br><br>    Defendants and Appellants. | A168791<br><br>(San Francisco City & County<br>Super. Ct. No. CGC20584310) |
| DIRK NEYHART, Individually and as Administrator, etc.<br><br>    Plaintiff and Cross-Appellant,<br>v.<br><br>PETER BRESLER, et al.<br><br>    Defendants and Cross-Respondents. | (San Francisco City & County<br>Super. Ct. No. CGC20584339) |

This is an appeal and cross-appeal in a legal malpractice action arising from a mistake by the administrator's attorneys in handling a probate estate.

The first issue, tendered by the defendant attorneys, is whether they owed a duty to, and thus can be sued by, the beneficiaries of a belatedly discovered will that was not timely filed with the probate court.  The trial court, after conducting a bench trial, concluded in its tentative decision the answer to this question is "no."  In its statement of decision, however, the court ruled the answer is "yes" and awarded the putative beneficiaries $1.068

million in damages. We conclude the court had it right initially and reverse the judgment in favor of the putative beneficiaries and against the attorneys.

The second issue, presented by the administrator of the intestate estate, who was also an heir of the estate, as well as a named beneficiary in the belatedly discovered will, is whether he was damaged by the attorneys' failure to timely probate the belatedly discovered will. The trial court ruled he was not and, in fact, received more from the estate as an intestate heir than he would have received under the will had it been admitted into probate. We agree and affirm the judgment in that respect.

## BACKGROUND

Dirk Neyhart began living with his then future wife, Patricia Spaugh, in 1995 in her house in Berkeley. Two years later, Neyhart was assaulted and seriously injured, leaving him legally blind, physically impaired, and with memory deficits. The couple remained steadfast, and Spaugh helped Neyhart "have a productive life," including by remaining in the house where they were residing and with which he was familiar.

Neyhart and Spaugh eventually married. Spaugh died in 2016.

### *Probate of Spaugh's Intestate Estate*

Shortly after Spaugh's death, a friend who assisted Neyhart found a will Spaugh had prepared but had not signed.[1] The unsigned will would have left the house to Cousin "with the request that she allow Dirk Neyhart to live there." The unsigned will also would have disinherited Spaugh's parents and brother (Brother). This was consistent with Neyhart's understanding that neither Spaugh nor her mother wanted the "wayward brother to get a dime."

---

[1] Neyhart hired personal assistants to assist him with many tasks, and Spaugh's cousin (Cousin) also assisted him. For simplicity's sake, we refer to actions by the assistants on his behalf as actions by Neyhart.

Neyhart and Cousin each consulted an attorney to see if the unsigned will could be honored. Neyhart contacted Faye Lee Bresler, who, in turn, brought in her husband and practice partner, Peter Bresler (collectively Bresler or the Bresler law firm). Cousin met with an attorney in her home state of Idaho. Both attorneys agreed the unsigned will was not valid. They also agreed the Berkeley residence would not pass to Cousin through intestate succession.

Bresler advised Neyhart that someone else could serve as administrator of Spaugh's estate: "for example, [Cousin] . . . can retain counsel; and she can be the one who files the Petition for Probate." However, Neyhart chose to retain the Bresler firm to assist him in administering the estate. Neyhart wanted "to find a way for the house to go [directly] into" Cousin's family trust. But if that were not possible, he thought it would be "prudent . . . for [him] to acquire title" and "leave the house to [Cousin's] trust" when he moved or died.

The law firm filed a petition seeking appointment of Neyhart as administrator and for issuance of letters of administration. Finding Spaugh died intestate, the probate court granted Neyhart's petition.

### The Belatedly Discovered Will

About six months after probate commenced, Neyhart, in early January 2018, found a will that Spaugh had signed five years earlier, in July 2013, and that had been duly witnessed (the operative will). This will stated Neyhart had the right to continue living in the Berkely residence until "he no longer wants to" and otherwise left the property to Cousin's daughters (Daughters) to be sold and proceeds distributed (in different percentages)

3

between them.[2] It also left specific bequests to more than a dozen named beneficiaries and expressly disinherited Spaugh's parents and Brother.

Neyhart e-mailed an electronic copy of the will to Bresler, saying he was trying to locate one of the witnesses. He gave Bressler no instructions.[3]

_____

[2] The will specifically provided: "I leave My [*sic*] house, . . . and all household furnishings to Dirk Neyhart. Household furnishings will remain with the house at his discretion. When he no longer wants to live at the house it is to be sold and the proceeds given to [Daughter 1] 34% and [Daughter 2] 66%, who will have . . . discretion over the disposition of the property. With my death, [s]he may immediately take whatever household furnishings and decorations that Dirk does not need for his continued comfort living in the house." ~(AA 369)~

The parties and the trial court have referred to Neyhart's interest in the property as a "life estate." Whether the bequest was technically a life estate under real estate law is immaterial to the disposition of the case.

[3] Neyhart's e-mail to Bresler stated: "Going through an old box of files I found one named Patricia [and] in that file was a sealed envelope entitled Patricia's will. The witness was one of her fellow singers they met at Eloise [B.'s] house and sang with six other women. I don't believe I've spoken to Eloise since Paticia's death. Eloise used to be my bookkeeper. She did a less than mediocre job. She lives about six blocks away. I know her phone number used to be in. . . . I was not successful today. She lives on. . . . I've asked a neighbor for her phone number, and she didn't have it handy but said she would get back to me." (Boldface omitted.)

About a week later, Neyhart sent Bresler another e-mail stating: "I think this a different will than the previous one found. The witness signature is clearly that of Brooke . . . who was at that time a student at UC Berkely. Brooke now lives somewhere around Los Angeles. I have her phone number and e-mail address. This will seemed more detailed than the prior will. Both wills are kept out of the house. If you or the court need the originals, they can be retrieved at a moment's notice."

About a week after that, Neyhart sent Bresler a third e-mail stating: "The first will I sent you, the most recent will, I had thought had been signed by Eloise. . . . I emailed Eloise and sent her a copy of the scanned signature and she said it was not hers. I emailed a former helper with whom I still have not spoken for many years and asked if it were her signature. Here is

4

Bresler responded, asking for the "names and addresses" of the subscribing witnesses so he could "send a letter to them to ask them to" execute needed documents. He added, "P.S. We are going to have to file another Petition for Administration because now we have the will as a roadmap for how [Spaugh] wanted to give away her assets." Bresler also told Neyhart to "provide the original wills" (one of which was the operative will) so they could be lodged with the court.[4]

Neyhart replied that he "[h]ope[d] to have all of the information to you within 10 days." He identified himself as one of the subscribing witnesses to the operative will and provided the name and e-mail address of the second witness (as well as the name and address of the witness to other, but not the operative, will).[5]

---

her reply saying yes. I don't know her phone number. She doubtless graduated from UCB years ago. I am pretty sure she lives . . . with her parents. Maybe the modern woman is shacked up with her fiancee [*sic*] in Paris. I don't know. If you need more information about her, you or I can email for her phone number."

[4] Bresler's e-mail to Neyhart stated: "Each will is going to have two witnesses. [¶] Then when a person passes away, the Administrator or Executor (you) will ask them to sign a form called a 'Proof of Subscribing Witness.' [¶] If you send their names and addresses to me-properly spelled (so that I don't make a mistake and misread them), then I can send a letter to them to ask them to sign and return the form to me. When I get the signed forms back them [*sic*] I will provide them to the court. [¶] I look forward to your information. [¶] . . . [¶] P.S. We are going to have to file another Petition for Administration because now we have the will as a roadmap for how Patricia wanted to give away her assets. [¶] Also, I will need you to provide the original wills (or wills) to me. The Court wants us to permanently lodge the original wills in the court's own files. [¶] Thanks again."

[5] Neyhart's e-mail to Bresler stated: "Will do. Hope to have all of the information to you within 10 days. The information I will provide is the worth of Patricia's house in September of 2016 and its worth now. Her Bank

Bresler made no mention of any deadline to lodge the newly discovered will with the court, either during the foregoing e-mail exchange or thereafter.

Bresler did not communicate with Neyhart about the belatedly discovered will for several months. He then sent Neyhart an e-mail stating he was "confused" about where the original of the operative will was and stressed to Neyhart "[t]his is very important to us and to the Court."[6] Neyhart finally mailed the original to Bresler 10 days later, at the end of April.[7]

Bresler lodged the original will with the court, and several months later, in July 2018, filed an amended petition seeking to probate the will and have Neyhart appointed executor.[8]

---

of America Acct on September 14, 2016 and now. Her Bank of the West Acct. September 2016 and now. And her Schwab Accts September 2016 and now. Right now, here are the emails of the two witnesses. [¶] April 2013: Brooke. . . . [¶] July 2013: Elizabeth. . . . [¶] I am the other witness for the July will."

[6] Bresler's e-mail to Neyhart stated: "The Courts have their own appraisers. They are called Probate Referees. We will arrange for a Probate Referee to appraised [*sic*] the residence. Then we will use the appraisal of the probate referee in the rest of the case. [¶] In the meantime, we will want to give the probate referee all of the rest of the evidence about estate assets- including the value of each account, etc. [¶] One item that I am still a little confused about: Where is the original will that you found? Do you still have it? [B]ecause if so, then I need to pick it up from you. This is very important to us and to the Court. Please get back to me on this point."

[7] Neyhart also sent an e-mail to Bresler stating: "Patricia Spaugh's will has been sent via certified mail to your office in San Francisco."

[8] The will did not name Neyhart as executor and stated, instead, "I request that Andrew Larson, Charles Schwab or someone he and Dirk Neyhart choose be the executor of my estate." Larson subsequently filed a nomination of Neyhart as executor.

During the time between the discovery of the operative will and the filing of the amended petition to probate the will, Cousin sent one e-mail to Bresler, three days after Neyhart notified Bresler of the discovery of the will. Cousin attached two documents that had been found that listed assets of Spaugh's estate. Cousin also accused Brother of having coerced his and Spaugh's mother (Mother) into naming Brother the beneficiary of Certificates of Deposit (CD's), replacing Spaugh. Cousin "just wanted both you (and Dirk) to be aware that these accounts were part of [Mother's] estate with Patricia listed as beneficiary, up until the night she died." Cousin stated the total amount of the CD's was "around $200,000" and she "thought both you and Dirk should be sure that these assets are properly dispersed, as described in Patricia's signed will." Her final comment was that "It is of utmost importance to me that Patricia's estate is properly directed. I do not want to see any misconduct or misappropriation of her funds. I trust you and Dirk can look into these funds to determine their legal distribution." Bresler did not respond to this e-mail.

At no time had there been, nor was there in the future, any communication between Bresler and Daughters. Cousin testified she "kept [Daughters] informed" that Bresler was "moving forward with the will."

### Challenge to Probating the Belatedly Discovered Will

As noted above, after Spaugh passed away, her mother died. Brother was named executor of Mother's estate, and in that capacity, after being apprised of the belatedly discovered will, Brother filed a petition in Spaugh's estate to remove Neyhart as administrator and for an order directing sale of the Berkeley residence and distribution of the proceeds, half of which would go to Mother's estate as an heir of Spaugh's intestate estate.

7

After the probate court accepted Bresler's amended petition as a petition to probate the belatedly discovered will, Brother filed another petition, this one contesting the validity of the will and Neyhart's request to be appointed executor.[9]

Cousin and Daughters became aware of the will contest (although not through communications from Bresler), and Cousin worked with Bresler to collect declarations to rebut Brother's claims. Discovery proceeded.

***Settlement of the Will Contest***

Eventually, Neyhart became dissatisfied with the Bresler firm and terminated its representation. He then retained Seth Skootsky, and the will contest went to mediation.

On the eve of the mediation, Brother asserted for the first time the petition to probate the will was untimely under Probate Code section 8226, subdivision (c) and *Estate of Earley* (2009) 173 Cal.App.4th 369 (*Earley*).

Skootsky immediately informed Neyhart and Cousin. He also told them *Earley* was "a very good case" for Brother and he had not found any "rebuttal."[10]

---

[9] The probate court was not at all happy that Bresler had filed an amended petition, rather than a new petition, to probate the will. And it was only because the court did not want to further delay the proceedings that it accepted the amended petition as a new petition to probate the will. The petition to probate the will did not, contrary to Daughters' repeated assertion, commence a new probate case. There was always *one* probate case, with all filings bearing the *same* case number, and in which a number of "petitions" were filed, including Neyhart's petition for probate an intestate estate, Brother's petition to remove Neyhart as administrator of the intestate estate, Neyhart's petition to probate the belatedly discovered will and for appointment as executor, and Brother's petition challenging the validity of the will.

[10] Assuming *Earley* applied, Neyhart needed to file a petition to probate the belatedly discovered will by March 2018, 60 days after he found

8

At the mediation the next day, at Skootsky's recommendation, Neyhart settled with Brother. Under the terms of the settlement, Neyhart would dismiss his petition to probate the belatedly discovered will and Brother would dismiss his petition to remove Neyhart as administrator of Spaugh's estate. Neyhart would also pay $475,000 from Spaugh's estate to satisfy Mother's estate's interest in it. This would leave Neyhart as the sole heir of Spaugh's intestate estate and he would therefore receive full fee title to the Berkeley residence. Daughters, like the other named beneficiaries of the belatedly discovered will, received nothing.

Cousin attended the mediation and, thus, was aware of the settlement.

Neyhart filed a petition for approval of the settlement by the probate court and for authorization for Spaugh's estate to borrow funds to pay Mother's estate for its interest in Spaugh's estate. All named beneficiaries of the operative will, including Cousin and Daughters, were given formal notice of the petition. No opposition was filed. The court approved the settlement and entered an order for final distribution of Spaugh's estate several months later.

### The Malpractice Actions

Daughters sued the Bresler firm for legal malpractice. Neyhart did the same in another case. The matters were consolidated and proceeded to a bench trial.

The court issued a tentative decision finding Bresler's failure to know there was a deadline for Neyhart to file a petition to probate the belatedly

---

the will. (See *Earley*, *supra*, 173 Cal.App.4th at p. 375 [proponent must petition to probate will by later of 120 days after issuance of order determining decedent to be intestate or 60 days after proponent obtains knowledge of will].) The amended petition accepted by the probate court as a petition to probate the will was not filed until July 2018.

discovered will constituted malpractice.  It went on to rule, however, that Bresler owed no professional duty to Daughters; as the trial court put it, Daughters lacked "standing" to sue the Bresler firm for the malpractice.  The court also ruled against Neyhart on the ground he sustained no damages as a result of Bresler's failure to advise him there was a deadline to probate the belatedly discovered will—as the sole intestate heir he received full fee title to the Berkely residence, while as a beneficiary of the will he would have received only the right to reside on the property for as long as he desired.

The court ultimately ruled, however, that the attorneys were liable to Daughters as third-party beneficiaries of Neyhart's retention of the Bresler law firm.  Relying on *Gordon v. Ervin Cohen & Jessup LLP* (2023) 88 Cal.App.5th 543 (*Gordon*), the court stated the key factor was whether " 'the client, in a clear, certain and undisputed manner, told the lawyer, "Do X" (where *X* benefits the [third party]).' "  The court found this factor was satisfied by Neyhart's transmission of the belatedly discovered will to Bresler, since Daughters were named beneficiaries and "[t]he harm to them of failing to probate it [was] entirely foreseeable."  The court awarded Daughters $1.068 million in damages.

## DISCUSSION

### *Attorneys' Appeal*

#### *Attorney's Duty of Care to Nonclients*[11]

Whether a lawyer owes a professional duty of care to third parties who were not their clients " 'is a question of law that we independently assess.' (*Gordon, supra,* 88 Cal.App.5th at p. 554; . . . *Chang* [*v. Lederman* (2009)]

---

[11]  The attorneys do not challenge the trial court's finding that Bresler's failure to advise Neyhart there was a statutory deadline to probate the belatedly discovered will constituted legal malpractice.

10

172 Cal.App.4th [67,] 76 ['Whether a lawyer sued for professional negligence owed a duty of care to the plaintiff "is a question of law and depends on a judicial weighing of the policy considerations for and against the imposition of liability under the circumstances" ']; *Carleton v. Tortosa* (1993) 14 Cal.App.4th 745, 754–755 . . . ['The degree of care and skill required to fulfill a professional duty ordinarily is a question of fact and may require testimony by professionals in the field. . . . However, expert testimony is incompetent on the predicate question whether the duty exists because this is a question of law for the court alone'].)" (*Grossman v. Wakeman* (2024) 104 Cal.App.5th 1012, 1021 (*Grossman*).)

" ' A lawyer has a "duty . . . to use such skill, prudence, and diligence as members of [the legal] profession commonly possess and exercise" when representing a client. . . . [¶] Although the lawyer's duty typically runs only to the client because that duty arises from the privity of contract that forms the lawyer-client relationship [citations], a lawyer can sometimes owe a duty to third parties who are the *intended beneficiaries* of the lawyer's legal work for the client, such as when the lawyer is retained by the client to draft a will, a testamentary trust, or an inter vivos trust or gift.' " (*Grossman, supra,* 104 Cal.App.5th at pp. 1022–1023, quoting *Gordon, supra,* 88 Cal.App.5th at pp. 554–555; see *Lucas v. Hamm* (1961) 56 Cal.2d 583, 591 (*Lucas*) ["We conclude that intended beneficiaries of a will who lose their testamentary rights because of failure of the attorney who drew the will to properly fulfill his obligations under his contract with the testator may recover as third-party beneficiaries."].)

" [O]ur Supreme Court has . . . articulated eight factors bearing on whether a lawyer should owe a duty to a nonclient. . . .' (*Gordon, supra,* 88 Cal.App.5th at p. 555.) 'After balancing [these] factors . . . , the California

11

courts have uniformly settled upon the following rule: A lawyer has a duty to a nonclient third party only if the client's intent to benefit that third party (in the way the third party asserts in their malpractice claim) is "clear," "certain" and "undisputed." [Citations.]' (*Id*. at p. 556.) [¶] '[W]hen the client's intent meets this heightened standard, there is less danger that the lawyer will be subject to conflicting duties to different nonclient beneficiaries because only those beneficiaries as to whom the client's intent is crystal clear may sue for malpractice.' (*Gordon, supra*, 88 Cal.App.5th at p. 557.) Moreover, this heightened standard reduces the danger that 'the recognition of a duty running to the nonclient plaintiff–and the resultant "recognition of liability" against the lawyer–"would impose an undue burden on the profession" . . . [citation] . . . [by] saddling the lawyer with open-ended liability that could act as a disincentive for lawyers to practice in that area of law and hence dry up access to the legal services in that area [citation].' (*Id*. at p. 556.)" (*Grossman, supra,* 104 Cal.App.5th at p. 1023; see *Goonewardene v. ADP, LLC* (2019) 6 Cal.5th 817, 830 (*Goonewardene*) ["the contracting parties must have a motivating purpose to benefit the third party, and not simply knowledge that a benefit to the third party may follow from the contract"].)

The courts in both *Grossman* and *Gordon*—which are will-drafting cases following the line of such cases decided in the wake of *Lucas, supra,* 56 Cal.2d at page 591—concluded this heightened "clear," "certain," and "undisputed" standard was not met.

"In *Gordon* the decedent (Claire) had three sons. Kenneth was one of the sons. Claire amended her trust to disinherit Kenneth's three children. Thereafter, with the assistance of her lawyers, Claire created three limited liability companies (LLCs) and transferred property into each of them. Claire 'assigned a 30 percent interest in each LLC to each of her three sons and

12

retained a 10 percent interest in each LLC for herself.' " (*Grossman, supra,* 104 Cal.App.5th at p. 1022, quoting *Gordon*, *supra*, 88 Cal.App.5th at p. 551.) "After Claire died, her son 'Bruce and his sons Steven and Brian [plaintiffs] . . . sued [Claire's lawyers] for legal malpractice on the theory that the lawyers in drafting the LLC operating agreements did not adhere to Claire's intent because they did not prohibit Kenneth's three children from inheriting any interests in the LLCs. Had the operating agreements done so, plaintiffs alleged, Kenneth's interests in the LLCs would have passed to [Claire's two other sons] upon Kenneth's death. . . .' " (*Grossman,* at p. 1022, quoting *Gordon*, at p. 553.) The trial court granted the lawyers' motion for summary judgment. The Court of Appeal affirmed. (*Grossman*, at p. 1022.) "[T]he plaintiffs' evidence," said the court, "did not meet the heightened standard: '[T]he lawyers did not owe plaintiffs a duty to draft the LLC operating agreements in a way that disinherited Kenneth's children because Claire's intent to disinherit Kenneth's children from being assigned any interest in the LLCs was not, as a matter of law, clear, certain or undisputed.' " (*Id.* at p. 1023, quoting *Gordon*, at p. 560.)

"*Gordon* set forth guidelines for determining whether a lawyer owes a duty of care to a nonclient: '[C]ourts will recognize a duty to a nonclient plaintiff–and thereby allow that plaintiff to sue the lawyer for legal malpractice–only when the plaintiff, as a threshold matter, establishes that the client, in a clear, certain and undisputed manner, told the lawyer, "Do *X*" (where *X* benefits the plaintiff).' . . . 'California courts have unfailingly rejected the existence of a duty where there is a question about "*X*." ' "[12]

---

[12] *Gordon* explained that this rubric is distilled from balancing the factors set forth in *Lucas*. (*Gordon, supra,* 88 Cal.App.5th at pp. 555–558.)

(*Grossman, supra,* 104 Cal.App.5th at pp. 1023–1024, quoting *Gordon*, *supra*, 88 Cal.App.5th at pp. 556, 559.)

In *Grossman,* the decedent's attorney prepared estate planning documents that left the entire estate to the decedent's fourth wife, disinheriting his sons and grandchildren. (*Grossman, supra,* 104 Cal.App.5th at pp. 1015–1016.) One of the sons and two of the grandchildren sued the decedent's attorney for malpractice, and a jury found in their favor. (*Ibid.*) The Court of Appeal reversed. (*Id.* at p. 1016.) There was, said the court, "a question about '*X*[]' "—that is, there was a question as to exactly what the decedent told his attorney to do. (*Id.* at p. 1024.) Although witnesses testified the decedent told friends and family he wanted to leave his estate to the plaintiffs, "the issue is not what [the decedent] told his friends and family members. The issue is what he told [his lawyer]. '[A] lawyer has no duty to a nonclient plaintiff beyond implementing the client's clear directive to "Do *X*" (when . . . *X* benefits that nonclient plaintiff).' " (*Ibid.*, quoting *Gordon*, *supra*, 88 Cal.App.5th at p. 559.)

" '[A] lawyer's duty to a nonclient does not extend to being a babysitter, a risk mitigation strategist, a sounding board, or a mental health specialist for the client. Making a lawyer liable in malpractice to a nonclient for failing to act in any role beyond the role of implementing the client's undisputed intent to benefit that nonclient is bad public policy because it places an "incentive [on the lawyer] to exert pressure on [the] client to complete and execute estate planning documents summarily" [citation], a result that contravenes the lawyer's overarching duty of loyalty to the client.' [Citation.] '[W]hen the client's intent [to benefit a nonclient] is anything less than abundantly clear, there is . . . a greater likelihood that the lawyer will be hit with a flood of malpractice claims brought by nonclient plaintiffs asserting

14

that the client "once promised them *X*" and the like. . . .' " (*Grossman, supra,* 104 Cal.App.5th at p. 1024, quoting *Gordon, supra,* 88 Cal.App.5th at p. 559.)

There is an additional layer to the third party beneficiary analysis with respect to claims against a fiduciary's attorney. That is because it has long been established that "when a fiduciary hires an attorney for guidance in administering a trust [or estate], the fiduciary alone, in his or her capacity as fiduciary, is the attorney's client." (*Borissoff v. Taylor & Faust* (2004) 33 Cal.4th 523, 529 (*Borissoff*); *Goldberg v. Frye* (1990) 217 Cal.App.3d 1258, 1267–1269 (*Goldberg*); see generally Gold et al., Cal. Civ. Practice: Probate and Trust Proceedings (2024) § 1:9 ["Duties to third parties"].)

"By assuming a duty to [an estate] administrator . . . , an attorney undertakes to perform services which may benefit legatees of the estate, but he has no contractual privity with the beneficiaries" absent a further agreement to this effect. (*Goldberg, supra,* 217 Cal.App.3d at p. 1267.)

Thus, "[t]he court in *Goldberg* held that the beneficiaries of a trust [did] not have standing to assert malpractice claims against an attorney hired by the fiduciary. This conclusion . . . follows from the general rule that an attorney owes a duty of care, and is thus answerable in malpractice, only to the client with whom the attorney stands in privity of contract. [Citation.] Exceptions have been recognized only rarely, and then only when the specific facts of the case showed that the beneficiaries who sought standing to sue the fiduciary's attorney were intended, third party beneficiaries of the contract to provide legal services." (*Borissoff, supra,* 33 Cal.4th at p. 530.) "The decision in *Goldberg,*" said the Supreme Court in *Borissoff*, was "entirely correct."[13]

---

[13] The high court went on to say that *Goldberg* did not address the issue before it—whether a successor *fiduciary* could sue an attorney hired by a predecessor *fiduciary* for malpractice in handling the estate. (*Borissoff,*

15

(*Borissoff,* at p. 530.; see *Goonewardene, supra,* 6 Cal.5th at p. 840, fn. 8 [citing *Goldberg* with approval as among cases illustrating that "a professional or other business entity that enters into a contract to provide services to an individual or entity does not owe a tort duty of care to a third party with respect to an economic loss allegedly incurred by the third party when recognition of such a duty of care to the third party would create a potential conflict of obligations for the professional or business entity in light of its responsibility to the individual or business with which it has contracted"].)

In *Goldberg,* the beneficiaries of the probated will sued the attorney for the administrator for negligence in settling a claim brought against the estate by the decedent's former wife. (*Goldberg, supra,* 217 Cal.App.3d at pp. 1261–1263.) As a result of the settlement, the estate was depleted and there were insufficient funds to pay the specific bequests provided by the will. (*Id.* at p. 1262.) The disappointed beneficiaries claimed the attorney was negligent in failing to notify them of the significance of the hearings at which the settlement agreement and a related agreement were approved and failing "to exercise reasonable care in the performance of services for the estate beneficiaries." (*Id.* at pp. 1262, 1267.) The beneficiaries were represented by independent counsel and were aware of the attorney's conduct they subsequently claimed constituted negligence. (*Id.* at p. 1267.)

The Court of Appeal first pointed out "it is well established that the attorney for the administrator of an estate represents the administrator, and not the estate." (*Goldberg, supra,* 217 Cal.App.3d at p. 1267.) Although it was "conceivable that the attorney for an administrator could undertake to

*supra,* 33 Cal.4th at p. 530.) The court held a successor *fiduciary* can pursue such claim. (*Id.* at p. 531.)

16

perform legal services at the behest of, and as attorney for, a beneficiary of the estate," there was no evidence "to support the establishment of an attorney-client relationship by virtue of direct contacts between [the attorney] and [the disappointed beneficiaries]." (*Ibid.*)

Thus, to pursue their claims, the beneficiaries had to establish "circumstances and principles, from which a duty may arise *absent* privity of contract, and not based upon an attorney-client relationship." (*Goldberg, supra,* 217 Cal.App.3d at pp. 1267–1268.) And in this regard, the court examined "six considerations: '(1) the extent to which the transaction was intended to affect the plaintiff; (2) the foreseeability of harm to the plaintiff; (3) the degree of certainty that the plaintiff suffered injury; (4) the closeness of the connection between the defendant's conduct and the injury; (5) the policy of preventing future harm; and (6) whether recognition of liability under the circumstances would impose an undue burden on the profession.' " (*Id.* at p. 1268, quoting 1 Mallen & Smith, Legal Malpractice (3d ed. 1989) § 7.11, p. 382.)

The "predominant inquiry" is "whether the principal purpose of the attorney's retention is to provide legal services for the benefit of the plaintiff. For example, the intention of a testator to benefit legatees, through the retention of an attorney to draft his will, can confer a cause of action in favor of a disappointed legatee against the negligent draftsman." (*Goldberg, supra,* 217 Cal.App.3d at p. 1268.) However, viewing the disappointed beneficiaries' claim in that light, the *Goldberg* court found "it impossible to conclude that the parties to the attorney's contract—[the administrator and the attorney]— entered into same for the principal purpose of providing benefit to the [beneficiaries]." (*Ibid.*) The court found "nothing to indicate that this attorney's retention was in any respect different from the typical retention of

17

counsel by the fiduciary of a decedent's estate.  As noted above, such retention constitutes the counselor the attorney for the fiduciary, and not the attorney for the estate, its beneficiaries, its creditors or others who may be interested therein."  (*Ibid*.)

The court pointed out there are "[i]numerable instances in modern practice" where services performed by an attorney "will benefit others beside his client."  (*Goldberg, supra,* 217 Cal.App.3d at p. 1268.)  But the "fact that third parties are thus benefited, or damaged, by the attorney's performance does not give rise to a duty by the attorney to such third parties, and hence cannot be the basis for a cause of action by the third parties for the attorney's negligence."  (*Ibid.*; see *Berg & Berg Enterprises, LLC v. Sherwood Partners, Inc.* (2005) 131 Cal.App.4th 802, 826 [citing *Goldberg* and holding attorney for assignee for the benefit of creditors (a fiduciary) owed no professional duty to particular creditor].)

"Particularly in the case of services rendered for the fiduciary of a decedent's estate," the *Goldberg* court "apprehend[ed] great danger in finding stray duties in favor of beneficiaries.  Typically in estate administration conflicting interests vie for recognition.  The very purpose of the fiduciary is to serve the interests of the estate, not to promote the objectives of one group of legatees over the interests of conflicting claimants.  [Citation.]  The fiduciary's attorney, as his legal adviser, is faced with the same task of disposition of conflicts.  It is of course the purpose and obligation of both the fiduciary and his attorney to serve the estate.  In such capacity they are obligated to communicate with, and to arbitrate conflicting claims among, those interested in the estate.  While the fiduciary in the performance of this service may be exposed to the potential of malpractice . . . , the attorney by definition represents only one party: the fiduciary.  It would be very

18

dangerous to conclude that the attorney, through performance of his service to the administrator and by way of communication to estate beneficiaries, subjects himself to claims of negligence from the beneficiaries. The beneficiaries are entitled to evenhanded and fair administration by the fiduciary. They are not owed a duty directly by the fiduciary's attorney." (*Goldberg, supra,* 217 Cal.App.3d at p. 1269.)

### *Attorneys Owed No Professional Duty to Daughters*

Daughters concede they had no attorney-client relationship with Bresler and their malpractice claims against him turn on their assertion they were third party beneficiaries of Neyhart's retention of Bresler.

They also acknowledge that under *Goldberg*, they cannot claim to be third party beneficiaries of Neyhart's retention of Bresler commencing in January 2017, when Bresler prepared the petition for probate of an intestate estate and appointment of Neyhart as administrator. Rather, they maintain there was a second retention that commenced in January 2018, when Neyhart sent Bresler the e-mail attaching a copy of the belatedly discovered will. They claim Bresler was not, in connection with this second retention, acting as a fiduciary's attorney but simply as counsel for the individual proponent of a will. According to Daughters, this second retention renders the instant case "factually distinguishable" from *Goldberg* and more like the will-drafting cases, and under the reasoning of the will-drafting cases, they can sue Bresler as third party beneficiaries of this latter retention.

Attorneys maintain no authority supports what they characterize as the "narrow exception" to *Goldberg* Daughters urge, that is based on a "fluctuating" professional duty of care that would "flash into being when the will is discovered, then flash off again as soon as the client is appointed" executor. Attorneys assert "[l]egal duties that flash into and out of existence

19

would be unmanageable and create a trap for counsel," and the reasoning of *Goldberg* is as apt here as in the specific facts of that case.

We agree with Attorneys.

To begin with, no evidence supports Daughters' second-representation predicate—that Neyhart and Bresler entered into a second representation wherein Bresler represented only Neyhart's personal interests and that Neyhart's and Bresler's primary purpose in entering this second representation was to benefit Daughters.

Daughters acknowledge there is no written agreement of a second retention, let alone an agreement stating Bresler was being retained in a different capacity than the one in which he had been serving, namely counsel for the fiduciary. Rather, Daughters rely solely on Neyhart's e-mail to Bresler attaching a copy of the belatedly discovered will, as evidencing this second retention.

In the preceding pages, we have quoted the entirety of not only Neyhart's e-mail to Bresler attaching a copy of the belatedly discovered will, but also Neyhart's other e-mails to Bresler during this same period of time, as well as Bresler's responding e-mails. These e-mails do not, individually or collectively, satisfy the intent-to-benefit-the-third-party standard as articulated either by the will-drafting cases or by *Goldberg*.

As articulated by the will drafting cases, a plaintiff seeking to sue as a third party beneficiary must establish that "the client, in a clear, certain and undisputed manner, told the lawyer, " ' "Do *X*" (where *X* benefits the plaintiff).' . . . 'California courts have unfailingly rejected the existence of a duty where there is a question about "*X*." ' " (*Grossman, supra,* 104 Cal.App.5th at p. 1024, quoting *Gordon, supra,* 88 Cal.App.5th at pp. 556, 559.) " '[W]hen the client's intent [to benefit a nonclient] is anything

20

less than abundantly clear, there is . . . a greater likelihood that the lawyer will be hit with a flood of malpractice claims brought by nonclient plaintiffs asserting that the client "once promised them *X*" and the like. . . .' " (*Grossman,* at p. 1024*.*) Moreover, "the issue is not what [the decedent] told his friends and family members. The issue is what he told [his lawyer]. '[A] lawyer has no duty to a nonclient plaintiff beyond implementing the client's clear directive to "Do *X*" (when . . . *X* benefits that nonclient plaintiff).' " (*Ibid.*, quoting *Gordon, supra*, 88 Cal.App.5th at p. 559.)

Neyhart's e-mails to Bresler did not direct Bresler to do anything, let alone direct him—"in a clear, certain, and undisputed manner"—to file a petition to probate the belatedly discovered will. In fact, the only explicit discussion between Neyhart and Bresler about the disposition of the residence was after Bresler advised Neyhart that Spaugh's unsigned will was invalid. Neyhart told Bresler at that time he wanted "to find a way for the house to go [directly] into" Cousin's family trust. But if that were not possible, he thought it would be "prudent . . . for [him] to acquire title" and "leave the house to [Cousin's] trust" when he moved or died.[14]

As articulated by *Goldberg* (which, as Daughters point out, cites to the leading will-drafting cases decided by our Supreme Court), "[t]he predominant inquiry" in determining whether a nonclient plaintiff can sue an attorney as a third party beneficiary "is whether the principal purpose of the attorney's retention [was] to provide legal services for the benefit of the plaintiff." (*Goldberg, supra,* 217 Cal.App.3d at p. 1168.) The e-mail exchange

_____

[14] That Neyhart ended up the sole heir of Spaugh's intestate estate and received fee title to the residential property, enables him to achieve his stated objective. We further observe that in both his briefing on appeal and at oral argument, Neyhart asserted he intends to follow through with this stated objective.

between Neyhart and Bresler does not come close to suggesting either that the purpose of Neyhart's retention of Bresler had changed and Bresler was no longer representing Neyhart's fiduciary interests, let alone that the *principal* purpose of the asserted second representation was to benefit Daughters. Bressler did not then, or ever, communicate with Daughters. In fact, Daughters were not even copied on the e-mails that assertedly created a second retention undertaken principally for their benefit.

In his filings with the probate court after discovery of the belatedly discovered will, Bresler identified himself as attorney for "Dirk Neyhart, Petitioner" (on all form petitions, whether pertaining to Spaugh's intestate estate or to probating the will) or as attorney for "Administrator and Respondent Mr. Dirk Neyhart" (on memoranda and declarations, whether filed in connection with Neyhart's administration of the intestate estate or in opposition to Brother's petition opposing probate of the will). In his motion to be relieved as counsel to facilitate Neyhart's retention of by Skootsky, Neyhart stated he was representing "an individual," "a personal representative," and "a probate fiduciary." Moreover, the amended petition to probate the will sought not only to have the will accepted into probate by the court, but also to have Neyhart appointed executor. Thus, Neyhart continuously identified himself as counsel for a fiduciary, and the purpose of the petition was as much to facilitate Neyhart's *continued* status as such, i.e., to transition from administrator to executor, as it was to have the will accepted by the court. In short, there is "nothing to indicate that [Bresler's continued representation of Neyhart] was in any respect different from the

22

typical representation of counsel by the fiduciary of a decedent's estate."[15] (*Goldberg, supra,* 217 Cal.App.3d at p. 1268.)

Daughters point out Cousin (their mother) sent one e-mail during the relevant time period to Bresler, copied to Neyhart, attaching copies of other documents that had been found that listed assets of Spaugh's estate and warning that Brother appeared to have received assets from Mother's estate that rightfully belonged to Spaugh's estate. As we have recited, Cousin stated she "just wanted both you (and Dirk) to be aware" of the assertedly misappropriated assets and "thought both you and Dirk should be sure that these assets are properly dispersed, as described in Patricia's signed will." She also stated it was "of utmost importance to me that Patricia's estate is properly distributed. I do not want to see any misconduct or misappropriation of her funds. I trust you and Dirk can look into these funds to determine their legal distribution."

The trial court expressly rejected Daughters' alternative duty theory— that, given Cousin's communication with Bresler, an "implied" attorney-client relationship was created between Daughters and Bresler. Daughters have not taken issue with this ruling on appeal. Indeed, Cousin's e-mail cannot be read as any kind of claim by Cousin that Bresler was her lawyer, let alone a claim that Bresler was now representing her Daughters. Again, Daughters were not copied on this e-mail. Nor did Bresler send a responding e-mail to Cousin, let alone to Daughters.

---

[15] We are not saying there is no difference in representation of Neyhart in his capacity as administrator and his capacity as an individual proponent of will. There obviously is, as payment for professional services provided to an estate fiduciary must be approved by the probate court and are paid by the estate, whereas payment for services to an individual heir or devisee must be paid from personal funds. But this distinction is not determinative of the third party beneficiary claim advanced here.

In sum, the e-mail from Neyhart to Bresler attaching a copy of the belatedly discovered will on which Daughters rely, does not establish either that Neyhart and Bresler entered into a second retention wherein Bresler no longer represented Neyhart's fiduciary interests, let alone that such representation was entered into primarily for Daughters' benefit.

The trial court reasoned Daughters were the stated beneficiaries of the belatedly discovered will and therefore it was "entirely foreseeable" they would be harmed if the will was not admitted to probate. But the same was true in *Goldberg*—there was no question the decedent intended that the disappointed beneficiaries take under the probated will and no question their interests would be adversely impacted by the alleged shortcomings and failures of the administrator's attorney. As *Goldberg* explains, this is not sufficient justification to hold a fiduciary's attorney liable to disappointed beneficiaries. (See *Goldberg, supra*, 217 Cal.App.3d at p. 1268.)

Significantly, unlike in the will-drafting cases, this is not a case where Daughters had no option but to rely on the Bresler law firm to protect their interests. In the will-drafting cases, the client selects the attorney and the attorney *completes* the allegedly incompetent services *prior* to the time the third party appears on the scene. Indeed, the client dies prior to the time the third party appears on the scene. At that juncture, the malpractice is irreparable. This was not the case here. Daughters had every right, themselves, to petition for probate of the belatedly discovered will, and they could have timely done so. (See *Bailey v. Bailey* (2023) 96 Cal.App.5th 269, 272 ["Generally, 'any interested person' may petition to admit a will to probate '[a]t any time after a decedent's death.' (§ 8000, subd. (a).").) Daughters also had every right to retain their own lawyer to protect their interests, and should have done so.

24

Given the record in this case, Daughters' position boils down to the assertion that because they were named beneficiaries, they could assume the attorney hired by another named beneficiary, and specifically the beneficiary whose lawyer was preparing a petition seeking to probate the will and to have his client appointed executor, was also protecting their own interests. No authority supports this proposition. And it is an ill-advised one.

Under this reasoning, the lawyer retained by one named beneficiary would owe a professional duty to *every* named beneficiary. Here, there were more than a dozen named beneficiaries of the belatedly discovered will. It is inconceivable a lawyer would, or should, conclude that being retained by one of these beneficiaries means the lawyer owes a professional duty to all the other named beneficiaries, as well. Indeed, it would impose on the profession the burden cases caution against. (See *Grossman, supra,* 104 Cal.App.5th at p. 1023 [" ' "recognition of liability" against the lawyer–"would impose an undue burden on the profession" . . . [citation] . . . [by] saddling the lawyer with open-ended liability that could act as a disincentive for lawyers to practice in that area of law and hence dry up access to the legal services in that area' "]; *Goldberg, supra,* 217 Cal.App.3d at p. 1268, quoting 1 Mallen & Smith, Legal Malpractice (3d ed. 1989) § 7.11, p. 382 [final factor in third party analysis is " 'whether recognition of liability under the circumstances would impose an undue burden on the profession' "]; see also *Goonewardene, supra,* 6 Cal.5th at pp. 838, 841 [rejecting claim that employee could sue payroll company for negligence in performing contractual obligations to employer, in part, because such liability "is likely to add an unnecessary and potentially burdensome complication to California's increasing volume of wage and hour litigation"].)

The trial court also commented that "imposing . . . liability" on the attorneys "create[d] no conflict at all" because the act supposedly "required" by Neyhart was "the act that would have benefited [Daughters]." To begin with, as we have explained, Neyhart did not "require" Bresler to perform any act. In any case, the conflict the will-drafting cases and *Goldberg* are concerned about is the potential for conflict arising during the course of probate proceedings. In other words, even if all parties with an interest in an estate profess to being on the same page at the outset of the proceedings, that may not remain the case down the line. (See *Baker Manock & Jensen v. Superior Court* (2009) 175 Cal.App.4th 1414, 1424 [it is not uncommon for "conflicts of interest [to] arise" in probate matters given the "close and overlapping interconnections between the testator, the executor, beneficiaries, and omitted heirs"]; *Goldberg, supra,* 217 Cal.App.3d at p. 1269 ["[t]ypically in estate administration conflicting interests vie for recognition"].)

There was plainly a potential for conflict here between Neyhart's interests and those of other parties interested in Spaugh's estate. Indeed, as soon as the belatedly discovered will was found, there was a conflict of interest between the intestate heirs (Neyhart and Mother's estate) and the named beneficiaries of the will. Indeed, Brother (as executor of Mother's estate) quickly filed a petition seeking to remove Neyhart as administrator of the intestate estate and for an order authorizing sale of the property and distribution of half the proceeds to Mother's estate. After the probate court accepted Neyhart's amended petition as a petition to probate the will and appoint him executor, Brother filed another petition, this one challenging the validity of the will and opposing Neyhart's self-nomination as executor. And eventually, when all of the pending petitions were sent to mediation, Neyhart

26

(represented at this point by Skootsky[16]) agreed to a settlement that benefitted only himself and made no provision for *any* of the other named beneficiaries of the belatedly discovered will, including Daughters. In short, what happened as the instant probate case unfolded exemplifies why there is "great danger in finding stray duties in favor of beneficiaries." (*Goldberg, supra,* 217 Cal.App.3d at p. 1269.)

In sum, neither the will-drafting cases nor *Goldberg* support Daughters' theory that upon the discovery of the executed will, Bresler suddenly owed a professional duty not only to his client Neyhart, but also to all the other named beneficiaries of that will and likewise became subject to malpractice claims by those beneficiaries, including Daughters.

We therefore reverse the judgment in favor of Daughters and against the defendant attorneys.

### Neyhart's Appeal

Neyhart claims he was entitled to sue the Bresler lawyers to recover $475,000, the amount paid by Spaugh's estate to settle the will contest brought by Brother as executor of Mother's estate.

The trial court ruled against Neyhart on the ground he failed to prove he was damaged, as he received more under the settlement as the sole intestate heir—full fee interest in the Berkely residence—than he would have received under the will—only the right to reside on the property as long as he chose to do so. Or looked at slightly differently, under both the provisions of the will and the laws of intestacy, Neyhart received the right of residence he

---

[16] Notably, Neyhart signed a written retention agreement with Skootsky that expressly stated Skootsky was representing Neyhart both in his capacity as fiduciary and as a proponent of the will. Daughters never claimed to be a third-party beneficiary of this representation. Nor is there any evidence or legal basis to support such a claim.

claims mattered to him. So, there was no change in his position in that regard. Pursuant to the settlement, he *also* received the remainder interest and, thus, ended up with full fee title to the residential property.

Neyhart first maintains the trial court erred as a matter of law by "fail[ing] to understand his peculiar-value . . . theory," which he grounds on Civil Code section 3355. That statute provides that where "property has a peculiar value to a person recovering damages for" its loss or damage, "that may be deemed to be its value against one who had notice thereof . . . or against a willful wrongdoer." (Civ. Code, § 3355.) According to Neyhart, this means his damages should have been calculated based solely on the unique value residing in the Berkeley residence had to him and no value should have been attributed to his fee interest (i.e. the value of his remainder interest) because of its unique lack of value to him. Neyhart argues: "[He] was supposed to have received the life-estate portion of the House's fee interest, for nothing. That property right was injured, and he was deprived of it, by Bresler's malpractice. Now, to obtain the life estate that he needed, he was forced to pay $475,000. In return, he received the life estate and the reminder interest—but the latter had no value to him." (Italics omitted.)

Neyhart cites no authority that remotely suggests Civil Code section 3355 can be invoked to reduce the fair market value of property—here, to zero, according to Neyhart—rather than to enhance it. Nor are we aware of any such authority. Neyhart points to a jury instruction stating that "[n]o fixed standard exists for deciding the amount of" property's peculiar value to an individual and the trier of fact "must use [their] judgment to decide a reasonable amount based on the evidence and . . . common sense." (CACI No. 3903L.) But this does not suggest the peculiar value doctrine can be used negatively to reduce the value of a property. To the contrary, authorities

28

observe that peculiar value " 'cause[s] the subject matter to be *more desirable* to the owner than to others,' " (*McMahon v. Craig* (2009) 176 Cal.App.4th 1502, 1519, italics added) and " 'deals with property which has a market value *and also a peculiar value to the owner*' " (*Kimes v. Grosser* (2011) 195 Cal.App.4th 1556, 1560, italics added).  In other words, under the peculiar value doctrine, an owner can recover *more* than the fair market value of the property.  Thus, the trial court did not misinterpret the doctrine.

Neyhart further claims no evidence supports the trial court's conclusion he received greater value as an intestate heir than he would have as a beneficiary under the belatedly discovered will.[17]  Specifically, he challenges the trial court's finding "that the remainder interest has its full, ordinary monetary value to Neyhart because he supposedly can 'sell' the House or

---

[17]  Neyhart acknowledges he is, in this respect, making a substantial evidence argument.  "Substantial evidence review requires that we ' " ' "consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings].  [Citations.]" [Citation.]  We may not reweigh the evidence and are bound by the trial court's credibility determinations.  [Citations.]  Moreover, findings of fact are liberally construed to support the judgment.' " ' (*Tribeca Companies, LLC v. First American Title Ins. Co.* (2015) 239 Cal.App.4th 1088, 1102 . . . ; accord, *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 334 . . . [' "questions as to the weight and sufficiency of the evidence, the construction to be put upon it, the inferences to be drawn therefrom, the credibility of witnesses . . . and the determination of [any] conflicts and inconsistencies in their testimony are matters for the trial court to resolve" ']; *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571 . . . [' "[w]hen two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court" '].)" (*Espinoza v. Hepta Run, Inc.* (2022) 74 Cal.App.5th 44, 52.)  "A single witness's testimony may constitute substantial evidence to support a finding." (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.)

otherwise 'benefit from the fee' with a 'reverse mortgage' or a 'home equity loan.' "

Neyhart first asserts he cannot " 'sell' " the residential property without "negating his life-estate interest—the right to live in the House (that he needs for daily living comfort) for the rest of his life." Whether Neyhart chooses to remain living on the property or to sell it are *choices* he is entitled to make as the full fee owner of the property. That he has such choices does not vitiate the fair market value of his remainder interest. Indeed, Neyhart cites no authority that supports such a damages theory. There is also ample admissible evidence supporting the trial court's finding that the fair market value of his full fee ownership of the Berkley property is greater than that of only a right to reside on the property. This includes evidence that most of the $475,000 payment by the estate to settle the will contest was based on the value of the remainder ownership interest.[18]

Neyhart next asserts he cannot "encumber the remainder interest by a mortgage or loan without diminishing or eliminating that interest that is supposed to go—fully intact—to [Daughters]." He maintains there was "no evidence whatsoever" about a " 'reverse mortgage' " or " 'loan' " on a remainder interest, and there was "uncontradicted evidence" he "has always intended, and continues to intend, that [Daughters] get the proceeds of the House when he dies." It is common knowledge, of course, that loans secured by real estate are tied to the fair market value of the property, and the trial court's examples of such are harmless commentary. In any case, even if the court strayed beyond the evidence in making these observations, Neyhart's actual complaint is, again, based on the fact he can, as the full fee owner of

---

[18] In short, the settlement cashed-out Mother's estate's interest in the Spaugh estate, which effectively left the value of Spaugh's estate *unchanged*.

the property, *choose* whether to encumber it.  He can choose not to, and, if he pays all tax and other assessments on the property, thereby ensure the full value of the property goes to his heirs, which he represents in his briefing will be Daughters.  But the fact that as the fee owner he has choices with respect to how he manages the property does not vitiate the value of the remainder interest.

The trial court correctly observed that "no matter how" one "calculate[s]" the value of the right to reside on the Berkeley property to Neyhart, "the fact remains that he already has it.  Before the malpractice, Neyhart could have expected to live in the House; now [(post-settlement)] he has the same right.  To be sure, he paid money to get it, but . . . he likely got back (ownership of the fee) more than what he paid.  The 'peculiar value' of the House remains his."

## DISPOSITION

That portion of the consolidated judgment awarding damages to Daughters (plaintiffs Melody Studer and Angela Ule) is reversed with directions to enter a new judgment in favor of defendants.  In all other respects, the judgment is affirmed.  Bresler and Lee shall recover their costs on appeal, half from Studer and Ule, and half from Neyhart.  (Cal. Rules of Court, rule 8.278(a)(3), (5).)

_____
Banke, Acting P.J.

We concur:


_____
Langhorne Wilson, J.


_____
Hill, J.*


*Judge of the San Mateo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.



A168791, Studer et al v. Bresler et al.